**GULF STATES UTILITIES COMPANY**

v.

**NEI PEEBLES ELECTRIC PRODUCTS, INC., et al.**

No. 88–898–A–M2.

United States District Court, M.D. Louisiana.

March 9, 1993.

540

L. Richard Westerburg, Jr., Baton Rouge, LA, on the motion for plaintiff, Gulf States Utilities Co.

Thomas E. Balhoff and Judith R. Atkinson of Mathews, Atkinson, Guglielmo, Marks & Day, Baton Rouge, LA, for defendants, NEI Peebles Elec. Products, Inc. and Northern Engineering Industries.

## RULING

NOLAND, United States Magistrate Judge.

This matter comes before the Court on a motion for summary judgment filed by defendants Northern Engineering Industries and NEI Peebles Electric Products, Inc. on June 29, 1992 as well as on a crossing motion for partial summary judgment filed by the plaintiff, Gulf States Utilities Company ("GSU"), on August 3, 1992. *See* Rec.Doc. Nos. 74 & 111. Northern Engineering Industries also has sought summary judgment in its favor on the ground that it is not liable for the acts of NEI Peebles Electric Products, Inc., which is a wholly-owned subsidiary of Northern Engineering Industries. The issues regarding the parent company's potential liability for the acts of its subsidiary will be addressed by the Court in a separate ruling. Further, in the present ruling, for ease of reference, the Court will refer to NEI Peebles Electric Products, Inc. and all of its predecessors-in-interest simply as "Peebles" without regard to the particular timeframe involved.

GSU brings redhibition, products liability and negligence claims against Peebles arising out of alleged defects in a diesel generator assembly manufactured by Peebles and sold to Transamerica Delaval, Inc. ("TDI") for incorporation into a standby emergency diesel generator system sold by TDI to GSU. The plaintiff further seeks recovery, in the alternative, as a third party beneficiary of the sales contract between TDI and Peebles. Peebles seeks summary judgment in its favor on the ground that the TDI–Peebles contract waived all implied warranties as well as recovery of consequential damages and contends that GSU has no greater rights against Peebles than would TDI. GSU seeks partial summary judgment in its favor striking this

defense, on the ground that any waiver or limitation contained in the TDI–Peebles contract is not effective against GSU and further on the ground that the TDI–Peebles contract does not in any event waive implied warranties or limit recovery of damages against Peebles.

### Relevant Factual Background

In the late 1970's, GSU began the construction of the River Bend Nuclear Power Plant ("River Bend") near St. Francisville, Louisiana. During the course of the River Bend project, GSU directed the project engineers, Stone & Webster Engineering Corporation ("Stone & Webster"), to seek bids for the design and manufacture of diesel generators. These generators would be used in a diesel generator system that would provide the backup electrical power necessary for a safe shutdown of the nuclear facility if the normal supply of electrical power were interrupted.

TDI was one of the concerns asked to bid on the diesel generators by Stone & Webster. TDI, in turn, by letter dated March 1, 1974, requested a proposal from Peebles for the sale of four 3500 KW, 450 RPM generators or, alternatively, of two 3500 KW/450 RPM generators and two 4200 KW/450 RPM generators. The request for a proposal reflected that it was made in connection with the GSU project. The request further directed that Peebles "[i]nclude a statement in your proposal to the effect [that] you are quoting in accordance with the project specifications," which were attached to TDI's request. The TDI request also reflected specifically that warranty for the sale would be "per spec." The enclosed project specifications provided that "[t]he Seller's equipment will be subjected to the following warranties[:] one year from initial operation as mutually agreed upon by both parties." [1]

By letter dated April 12, 1974, Peebles submitted an unpriced quotation to TDI for the sale of diesel generators in response to the March 1, 1974 TDI request for proposals. The April 12, 1974 letter acknowledged receipt of the project specifications and submitted the Peebles quotation "in accordance" therewith. On page 4 of the letter, the Peebles quotation stated:

> Our normal warranty on nuclear power plant equipment is 18 months from date of shipment, or one year from startup, whichever occurs *first*. If it is necessary for us to extend the warranty on this equipment beyond this normal period it will be necessary that we review the period of time involved, and the facilities for storage, in advance of receipt of award.

Inserted along with the text of the quotation letter was an additional page of printed boilerplate terms and conditions. This inserted page of small print included the following terms and conditions regarding warranties, limitation of recoverable damages, terms of acceptance and modification and waiver of terms:

**Warranties—**

> Seller warrants to Buyer that at the time of the delivery of the goods described in this quotation, it will rightfully transfer title therein to Buyer and that such goods will be of merchantable quality, and Seller warrants the goods quoted against defects in material and workmanship for a period of one year from the date of their delivery.
>
> Any description of goods other than goods manufactured by Seller contained in this quotation is for the sole purpose of identifying them and shall not be the basis of any bargain between Seller and Buyer and does not constitute a warranty that the goods shall conform to that description; likewise the use of any sample or model in connection with this quotation or negotiations relating thereto is for illustrative purposes only and is not intended to be part of the basis of any bargain between Seller and Buyer and is not to be construed as a warranty that the goods will conform to such sample or model. No representative of Seller is authorized to make any guarantee or representation not strictly in accordance with the terms of this quotation and Seller makes no warranty as to the fitness

---

1. *Attachments to Defendants' Motion for Summary Judgment,* filed June 29, 1992, Rec.Doc. No. 76, Exh. "Y"; *Attachments to Plaintiff's Memo. in Opposition,* filed Aug. 3, 1992, Rec. Doc. No. 96, Exh. "B".

of any of the goods described in this quotation for any purpose.

.    .    .    .    .

Seller shall not be liable to Buyer for the breach of any warranty unless Seller receives written notice thereof within one year from the date of delivery as defined in this quotation.

### Damages and Remedies—

If any goods or parts of goods delivered by Seller to Buyer are defective in such a manner as to breach any warranty or warranties by which Seller is bound to Buyer, Seller may, at its option, either repair any such defective goods or parts of goods or make available f.o.b. Seller's plant a repair or replacement part to correct any such defect.   . . . .

In no event, whether liability is based upon Seller's breach of warranty, failure to perform any agreement or part of its agreement for the sale of the goods here quoted upon, negligence, strict liability under the laws of any state, tort, or any other cause, shall seller be liable to Buyer or to any other person except for the repair or replacement of defective or nonconforming goods or parts of goods and Seller shall not be liable under any circumstances to Buyer or any other person for consequential damages or special damages of any nature.

The foregoing shall constitute the sole remedies of Buyer and the sole liabilities of Seller.

### Terms of Acceptance—

Seller shall not be bound under any order placed by Buyer under the terms of this quotation unless and until such order by Seller is formally acknowledged and accepted in writing by one of Seller's authorized officers at its main office in Cleveland, Ohio.  Seller shall not be bound by any term or condition contained in Buyer's purchase order not consistent with the terms of this quotation except as may be expressly agreed upon in Seller's acknowledgment of such order.

### Modification and Waiver—

No waiver, modification, or alteration of any of the terms or conditions of this quotation shall be binding upon the Seller unless accepted by Seller in writing and signed by one of Seller's authorized officers at its main office in Cleveland, Ohio.

There are no understandings or agreements, oral or written, relative to Seller's quotation that are not stated herein.[2]

Peebles followed this quotation letter with an April 17, 1974 letter that supplied prices for the proposal as well as additional information concerning the equipment.  The April 17, 1974 letter concluded with the statement that "[a]ll of the other terms, conditions, etc., outlined in our April 12, 1974 proposal shall remain unchanged."[3]

Thereafter, GSU awarded TDI the contract to furnish the diesel generators.  Stone & Webster advised TDI that it had been awarded the contract by a telex dated July 23, 1974.[4]

By letter dated August 16, 1974, Peebles wrote to TDI "to acknowledge your subject purchase order and to confirm the information conveyed during our meeting of August 12, 1974."  Paragraph 1 of the letter provided price escalation information and then stated that "[a]ll other technical information, and terms and conditions should be in accordance with our April 12, 1974 formal proposal." The letter further included another copy of the page of boilerplate terms and conditions that had been included with the earlier April 12, 1974 quotation letter.  This page included the same provisions regarding warranties, limitation of recoverable damages, terms of acceptance and modification and waiver of terms that have been set out in detail above in the text in connection with the April 12, 1974 letter.  Paragraph 8 of the August 16, 1974 letter stated that Peebles "would appreciate receipt of your confirming purchase order and engineering procurement specifications as soon as possible."  The letter closed with the following: "We thank you for your

---

2. Rec.Doc. No. 76, Exhibit "A".

3. Rec.Doc. No. 76, Exhibit "Z".

4. Rec.Doc. No. 96, Exhibit "E".  A formal purchase order was issued to TDI on December 31, 1974.  *Id.*, Exhibit "T".

purchase order and we would appreciate if you would expedite the necessary paperwork as soon as possible." [5]

On November 13, 1974, TDI issued a purchase order to Peebles for four generator assemblies. The following was typed on the face of the purchase order in block print:

THIS ORDER IS ISSUED TO PROCURE THE MATERIAL BELOW FOR OUR PROJECT NAMED "GULF STATES." ATTACHED HERETO AND MADE A CONTRACTUAL PART OF THIS PURCHASE ORDER ARE OUR DOCUMENTS TITLED "CONTRACT REQUIREMENTS," "DATA SUBMITTAL AND MATERIAL SHIPMENT," "VENDOR CERTIFICATION OF SHIPMENT" AND OUR TECHNICAL SPECIFICATION 74039–101. EQUIPMENT SHALL BE MANUFACTURED IN EXACT ACCORDANCE WITH SPECIFICATION UNLESS OTHERWISE ADVISED IN WRITING.

The following warranty provision also was typed in block print on the face of the purchase order:

WARRANTY
ONE YEAR FROM START OF COMMERCIAL OPERATION. THIS ORDER IS SUBJECT TO LONG TERM STORAGE PER E.P. PORTEC "RECOMMENDED LONG TERM STORAGE PROCEDURE."

The "Contract Requirements" document incorporated into the purchase order further defined the "Contract Documents" as follows:

a. Purchase Order

(1) Copy—Manufacturers File

(1) Copy—Acknowledgement to Return

b. Contract Requirements—General Provisions

c. Technical Specifications

d. Vendor Certification of Shipment

e. Instructions for Data Submittal and Material Shipment

Smaller block print on the face of the purchase order, above the signature line, provided that "ACCEPTANCE OF THIS ORDER OR FURNISHING GOODS ORDERED HEREUNDER SHALL CONSTITUTE ACCEPTANCE OF ALL CONDITIONS STATED ON FACE AND REVERSE SIDE OF THIS ORDER." A page of boilerplate terms and conditions was set forth on the reverse side of the purchase order. This page of small print included the following terms and conditions regarding acceptance, content of the contractual agreement, and warranties:

3. ACCEPTANCE—By accepting this Order or making any deliveries hereunder Seller agrees to all of the terms and conditions herein stated and to fill this Order and make all deliveries as required hereby. This Order together with any written documents which may be attached hereto or incorporated herein by reference constitutes the entire agreement between the parties and supersedes all other oral or written communications between them. No stipulations, representations or agreements by Purchaser or any of its agents shall be binding on Purchaser unless reduced to writing and made a part of this Order as provided above and no trade custom shall alter or vary the terms hereof. No terms stated by Seller in accepting or acknowledging this Order shall be binding upon Purchaser unless accepted in writing by Purchaser.

.    .    .    .    .

10. WARRANTIES—Seller warrants that merchandise shall be of the kind and quality specified herein, shall be free from all defects in workmanship or materials and will conform to applicable drawings, specifications, samples or other descriptions, including applicable Government specifications as revised from time to time, or if not ordered to specifications will be fit and sufficient for the purpose intended by Purchaser. All such warranties shall run to Purchaser, its successors and assigns, and are also for the express benefit of Purchaser's customers and the users of its products, in addition to any other remedies referred for a period of time, reasonable under the circumstances of purchase and intended use, for attempted rework or con-

5. Rec.Doc. No. 76, Exhibit "AA".

formance to specifications or warranties and then either retained by Purchaser with an equitable price reduction or returned to Seller at Purchaser's expense, for credit, repair, replacement or with cancellation of this Order, all as Purchaser may elect.

. . . . .

**21. FURTHER STIPULATIONS**—All warranties herein shall be construed as conditions as well as warranties and the warranties and conditions herein contained shall not be deemed to be exclusive.[6]

During this same period of time, by letter dated November 15, 1974, C.H. Moeller, TDI's Project Manager, wrote to Portec's [Peebles'] Regional Manager, L.C. Madison. Moeller's November 15, 1974 letter was referenced "DELAVAL Nuclear Projects 'Warranty Requirements'" and was sent in response to Madison's October 31, 1974 letter to TDI's Ron Wood. Madison's October 31, 1974 letter to Wood had concerned a purchase order on a different project, the Middle South Energy Project, and had included, *inter alia*, a warranty provision prepared by Peebles. Writing for TDI, Moeller stated unequivocally that "Item 3 of your letter which relates to 'Warranty' is unacceptable, [and] therefore [is] the purpose of this letter." Moeller explained as follows:

> To begin with, DELAVAL does not accept any changed conditions to our purchase agreement without reviewing the modified requirements. The warranty conditions attached to your letter of October 31, 1974 are not inaccord [sic] with your confirming proposal dated May 31, 1974, particularly as they pertain to additional charges for extended warranty.
>
> As we previsouly [sic] advised you, our warranty with our customer for each of our Nuclear projects is "One (1) year from date of commercial Operation". Our warranty is further conditioned to the extent that the customer must maintain the equipment in the manner prescribed by DELAVAL for the period of time from

receipt of the equipment at the jobsite to the date of commercial operation. In addition we have developed a reporting system which requires the customer to document the maintenance of our procedures.

. . . . .

> For your reference we are attaching a listing of DELAVAL Nuclear projects which indicates the estimated date of commercial operation. Your company is a participant on each of the projects listed and the above warranty will be applicable.
>
> In the event your company has developed new warranty conditions for Nuclear projects then these conditions should be reviewed with our Sales Management prior to our submitting our proposals on future requirements.

In closing, Moeller invited Madison to contact him if he had any questions in regard to the warranty issue.[7]

Peebles' Madison, apparently without having first seen the November 15, 1974 Moeller letter, wrote to TDI's Ron Wood by letter dated November 19, 1974. Madison's November 19, 1974 letter stated that Peebles had received TDI's November 13, 1974 purchase order and that Peebles wished to make a number of comments regarding the purchase order. Madison noted that there was no reference in the purchase order to Peebles' April 12, 1974 proposal "which includes the escalation, terms, conditions, etc." or the final price confirmation letter dated August 16, 1974. Madison stated that "[t]hese two submittals are part of the order and should be referenced in the formal purchase order." Madison also noted, *inter alia*, that the warranty shown on the purchase order was for one year from date of commercial operation whereas the warranty set forth on page 4 of the April 12, 1974 proposal did not exceed one year from date of start-up. In closing, Madison stated that Peebles "would appreciate your review of the preceding and bring-

---

**6.** Rec.Doc. No. 76, Exhibit "B"; Exhibit "1" filed behind Rec.Doc. No. 104. These two exhibits actually pertain to a single original document which was produced in piecemeal fashion due to an apparent error in copying the original document for production.

**7.** Rec.Doc. No. 76, Exhibit "BB".

ing your formal purchase order up to date accordingly." [8]

On or about December 20, 1974, Peebles' Madison addressed a letter to TDI's Moeller regarding TDI's "November 15, 1974 letter concerning warranty requirements on the four nuclear projects now order." Handwritten material on the letter reflects that it was copied for the project files in project numbers 74010–12, 74033–36, 74039–42 and 74046–53. Project number 74039–42 referred to the Gulf States project. Madison's letter stated:

> Attached you will find "Special Warranty Provisions", dated November 8, 1974, which we believe should be more in agreement with that which we have discussed in the past. We would appreciate if you would review this and let us know if this is acceptable to you on these jobs as well as future jobs involving nuclear power plant equipment.

The three-page "Special Warranty Provisions" enclosure contained a proposed standard warranty clause, a proposed extended warranty clause, and a proposed deferred warranty clause. The proposed standard warranty extended "within one year from the initial equipment startup or 18 months from date of shipment, whichever occurs first." The proposed standard warranty clause included the statement that "NO EXPRESSED OR IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR PURPOSE SHALL APPLY" as well as language purporting to limit or exclude the availability of consequential damages.[9]

Peebles' Madison again wrote to TDI's Ron Wood on February 12, 1975 with regard to seven points concerning the November 13, 1974 TDI purchase order. Madison opened the letter stating that "[r]eviewing the subject order we will appreciate your immediate response to the following." Madison again noted that the November 13, 1974 TDI purchase order did not include "our formal proposal dated April 12, 1974 which includes the escalation, terms, conditions, etc, or our final

price confirmation dated August 16, 1974" and that "[t]hese two submittals are part of this order, and should be referenced accordingly in the formal purchase order." Madison further stated, *inter alia,* that "[t]he warranty you have described in the purchase order dated November 13, 1974 is not correct, and we refer you to our December 20, 1974 letter to Carl Moeller to which we attached the "special warranty provisions" dated November 8, 1974." Madison closed the letter advising that Peebles "would appreciate your assistance in responding to the foregoing questions as soon as possible." [10]

A TDI internal memorandum from Moeller to Wood dated February 24, 1975 addressed the four nuclear projects, including the Gulf States project, and "serve[d] to confirm our meeting with Len Madison on 20 February concerning the referenced projects and specifically [Peebles'] letter's [sic]" outlined therein. On page 2 of the internal memorandum, under item (e), Moeller discussed the first six points raised in Madison's February 12, 1975 letter to Ron Wood. In regard to the first point raised, the internal memorandum states that "Ron Wood is to modify the P.O. to [Portec] to include the escalation clause and the terms and conditions." And, on page 3 of the internal memorandum, under item (f), Moeller addressed the "[letter dated 2/12/75 'Warranty.'" In this regard, Moeller stated:

> Ron Wood is to write to [Peebles] advising that the Warranty provisions attached to their letter dated 2/12/75 are acceptable for LILCO, Middle South Energy, Gulf States and Carolina Power & Light with the exception of the three (3) year time limit stipulated under the extended warranty provisions. The above four (4) projects will have a one (1) year warranty from the date of commercial operation.[11]

There is no evidence in the record that Ron Wood or anyone else from TDI ever modified the purchase order to incorporate the Peebles terms and conditions or ever wrote to Peebles advising that the standard

8. Rec.Doc. No. 76, Exhibit "CC".

9. Rec.Doc. No. 76, Exhibit "DD".

10. Rec.Doc. No. 76, Exhibit "EE".

11. Rec.Doc. No. 76, Exhibit "FF".

warranty clause proposed under Peebles' December 20, 1974 and February 12, 1975 correspondence had in fact been accepted by TDI following full review of the proposed warranty provision. Indeed, on April 9, 1975, Madison again wrote to Wood stating that Peebles had not received a response to his February 12, 1975 letter and that the seven items discussed therein "still need to be answered." [12]

Between April 15, 1975 and September 2, 1981, TDI issued one written addendum to the November 13, 1974 purchase order and 13 written change orders to that purchase order. The addendum and change order number 1 each addressed a point that had been covered in Peebles' February 12, 1975 letter and TDI's February 24, 1975 internal memorandum. However, neither the addendum nor any of the change orders incorporated the terms and conditions of Peebles' April 12, 1974 and August 16, 1974 correspondence as terms of the sales contract. And neither the addendum nor any of the change orders incorporated or adopted the proposed standard warranty clause upon which Peebles apparently now relies in this litigation. The addendum and each change order stated: "ALL ELSE REMAINS THE SAME" and change order number 4 stated, further, that the pieces covered by the change order were "SUBJECT TO ALL TERMS AND CONDITIONS OF THE ORIGINAL PURCHASE ORDER." [13]

By letter dated November 23, 1977, TDI's Moeller wrote to Stone & Webster to provide additional information relative to revised delivery requirements for the River Bend project. In the course of the three-page letter, which covered a wide variety of details, Moeller stated the following with regard to warranty:

> As we have previously advised, Delaval will maintain the present contract warranty provision which is one year from date of commercial operation provided the equipment is maintained in the manner prescribed by Delaval from the date the equipment is delivered to the customer up to the date of commercial operation.
>
> In the event extended warranties are requested then the specific requirements will have to be reviewed for potential cost impact (example: refer to Electric Products' letter dated 10/13/77).

Moeller enclosed a copy of a letter dated October 13, 1977 from Peebles' Michael R. Dorrington to TDI's B.C. Guntrum. The Peebles letter was written in response to Guntrum's October 5, 1977 letter concerning escalation and warranty provisions. After providing some specific information, Dorrington stated:

> In addition, please refer to the attached Deferred Warranty, which is available for a per unit price addition of 1% per year for each year beyond the three year limit of our Extended Warranty to a maximum of five years from the date of shipment.

Dorrington enclosed a copy of the three-page "Special Warranty Provisions" memorandum dated November 8, 1974 which included, in addition to the draft Extended Warranty and Deferred Warranty provisions referenced in the letter, the draft Standard Warranty Clause that Peebles' had proposed to TDI previously in its December 20, 1974 correspondence. Neither Moeller's November 23, 1977 letter nor Dorrington's October 13, 1977 letter ever referenced the proposed Standard Warranty Clause in their warranty discussions and, indeed, the warranty period described in Moeller's letter is not the same as that in the proposed Standard Warranty Clause.[14]

In a handwritten internal memorandum sent by TDI's C. Herrmann to TDI's R. Soderholm and dated June 19, 1979, Herrmann outlined the warranty status of the generators on all TDI nuclear projects. With regard to the Gulf States project and corresponding purchase order to Peebles, Hermann stated:

> Warranty is extended for one year after commercial operation provided the customer the customer [sic] follows explicit in-

12. Rec.Doc. No. 96, Exhibit "K".

13. Rec.Doc. No. 96, Exhibit "J".

14. Rec.Doc. No. 116, Exhibit "12".

structions as outlined under [Peebles'] Extended Warranty provisions.[15]

It perhaps is noteworthy that Peebles' proposed extended warranty provision provided for a warranty period of "3 years from date of shipment, not to exceed one year from date of startup, whichever occurs first," and not for an "extended" warranty period of one year from date of commercial operation.[16] The "extended" warranty period of one year from date of commercial operation is found only in the original TDI request for bids and in the TDI purchase order of November 13, 1974 and is not found in any of the documents sent by Peebles that Peebles now claims became a part of the contract between the parties.

The River Bend facility began commercial operation on June 16, 1986. On October 27, 1987, a routine inspection revealed that the wires on one of the Peebles' rotor poles were delaminating. This suit followed on October 26, 1988. GSU seeks recovery of, *inter alia*, its repair costs and "downtime" losses.

No other documentary evidence regarding the terms of the agreement between TDI and Peebles is to be introduced and the parties do not suggest herein that the content and terms of the agreement between TDI and Peebles is to be established by oral testimony at trial. The parties' positions herein are based entirely on the foregoing written record that presently is before the Court on the pending motions.

### Discussion

 As this matter is before the Court on crossing motions for summary judgment, the basic question before the Court is whether the evidentiary materials on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Pro. 56(c). Summary judgment must be entered against a party who has the burden of proof at trial on a claim or defense when that party fails to make an evidentiary showing in opposition to the motion sufficient to establish the existence of an element essential to the claim or defense. *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). For a failure of proof concerning an essential element of the party's claim or defense necessarily renders all other facts immaterial on that claim or defense. *Id.* There is no genuine issue for trial on a claim unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party on the claim or defense. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). If the evidence on a claim is merely colorable or is not significantly probative, summary judgment may be entered against the nonmoving party on the claim or defense. *Id.*

Peebles seeks summary judgment in its favor on the ground that the TDI–Peebles agreement waives any implied warranty claims that GSU might assert and that the agreement further precludes recovery of indirect and consequential damages. In this regard, Peebles contends that, under the Fifth Circuit's decision in *Datamatic, Inc. v. International Business Machines, Corp.,* 795 F.2d 458 (1986), GSU's rights against Peebles arise only by way of subrogation to TDI's rights and that GSU, as subrogee, therefore has no greater rights than would its subrogor, TDI. Peebles further contends that Peebles' proposed contract language waiving implied warranties and precluding recovery of consequential damages became part of the TDI–Peebles contract, such that, as TDI's subrogee, GSU cannot recover for breach of implied warranties and cannot recover consequential damages. GSU, in turn, seeks partial summary judgment in its favor on Peebles' warranty and damages waiver defense, contending that *Datamatic* is not applicable to this case and, further, that the record establishes as a matter of law that Peebles' waiver and limitation language did not become part of the TDI–Peebles contract.

The Court therefore is presented with two basic questions on the pending cross-motions. The first question is whether, under *Datamatic,* any waiver or limitation existing in

---

**15.** Rec.Doc. No. 76, Exhibit "GG".

**16.** Rec.Doc. No. 76, Exhibit "DD" (extended warranty provision).

the TDI–Peebles contract is effective against GSU. The second question is whether the TDI–Peebles contract in fact waived implied warranty claims and recovery of consequential damages. If the answer to both questions is "yes," then Peebles' will be entitled to judgment in its favor on at least GSU's redhibition claim. If the answer to either question is "no," then GSU will be entitled to a partial judgment in its favor striking Peebles' contract defense based upon the TDI–Peebles sales contract.

The parties agree on a number of points. First, the parties agree that GSU has no express warranty claim under the TDI–Peebles contract because the alleged defect in the rotor pole was not discovered until more than one year after commercial startup of the River Bend facility. Second, the parties agree that the questions presented on the cross-motions concerning the effect of the TDI–Peebles contract are questions of law that properly are to be resolved by the Court on the pending motions rather than submitted to the jury for decision.[17] Third, the parties agree that a contract of sale did in fact arise between TDI and Peebles, with the only dispute being as to what terms and conditions were incorporated into that contract of sale. And, fourth, the parties agree that the question of what provisions were incorporated into the TDI–Peebles contract is to be decided under California law and, specifically, under Section 2207 of the California Uniform Commercial Code.

Turning to the first issue, the Court will assume, *arguendo*, that GSU's redhibition claim is governed by Judge Rubin's opinion for the Fifth Circuit in *Datamatic* and that GSU therefore is subject, as TDI's subrogee, to whatever limitations and defenses that Peebles could raise against TDI under the TDI–Peebles sales contract.

As noted above, the parties agree that the basic question of which terms were incorporated into the TDI–Peebles contract is governed by Section 2207 of the California Uniform Commercial Code. Section 2207 provides as follows:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) The offer expressly limits acceptance to the terms of the offer;

(b) They materially alter it; or

(c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this code.

Cal.Com.Code § 2207.

Each party seeks the high ground of "offeror" status for the purpose of applying Section 2207. Peebles' contends that its April 12 & 17, 1974 and August 16, 1974 quotation letters constitute the offer. Peebles' further contends that the warranty and damage limitation terms and conditions attached to this correspondence became a part of the contract, under paragraphs (a) through (c) of subsection (2) of Section 2207, because the boilerplate terms and conditions of the quotations limited acceptance to the terms and conditions of the quotation letters, because TDI's warranty terms and conditions would constitute a material alteration of Pee-

---

**17.** *Accord Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440, 1442 (9th Cir.1986); *Mead Corporation v. McNally–Pittsburg Mfg. Corp.*, 654 F.2d 1197, 1206 (6th Cir.1981); *Frank M. Booth, Inc. v. Reynolds Metals Co.*, 754 F.Supp. 1441, 1446–47 (E.D.Cal.1991).

bles' terms and conditions, and because Peebles objected to TDI's terms and conditions. GSU contends, on the other hand, that TDI's November 13, 1974 purchase order was the offer and that Peebles' accepted those terms and conditions by performing under the sales contract, with Peebles' own terms and conditions never becoming part of that contract under Section 2207(2).

The Uniform Commercial Code does not define the term "offer." *E.g., Brown Machine v. Hercules, Inc.,* 770 S.W.2d 416, 418–419 (Mo.App.1989).[18] Thus, while Section 2207 clearly abrogates the common law rule that the acceptance must constitute a "mirror image" of the offer for a contract to be formed under the terms of the offer,[19] courts nonetheless must continue to first look to the common law to determine which communication constituted the "offer" in order to apply the provisions of Section 2207. *E.g. id.* Under the common law, an offer is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."[20]

Under the common law, a price quotation or proposal does not generally constitute an offer; the purchase order usually is the first document having the legal attributes of an offer. *See, e.g., F.C. Tomlinson v. Wander Seed & Bulb Company,* 177 Cal. App.2d 462, 470–71, 2 Cal.Rptr. 310, 314–15 (1960); *accord Brown Machine,* 770 S.W.2d at 419; *Interstate Industries, Inc. v. Barclay,* 540 F.2d 868, 871–73 (7th Cir.1976); *Master Palletizer Systems v. T.S. Ragsdale Co.,* 725 F.Supp. 1525, 1531 (D.Colo.1989); *see also Richards v. Flower,* 193 Cal.App.2d 233, 236, 14 Cal.Rptr. 228, 230 (1961). It of course is true that a seller's price quotation or proposal, if detailed enough, can amount to an offer creating the power of acceptance in the buyer. *E.g., Brown Machine,* 770 S.W.2d at 419. However, "to do so, it must reasonably appear from the price quote that assent to the quote is all that is needed to ripen the offer into a contract." *Id.* A price quotation that is subject to the seller's confirmation is not an offer because the buyer's assent will not consummate the contract. *Quaker State Mushroom Company, Inc. v. Dominick's Finer Foods, Inc.,* 635 F.Supp. 1281, 1284 (N.D.Ill.1986); *see also McCarty v. Verson Allsteel Press Co.,* 89 Ill.App.3d 498, 44 Ill.Dec. 570, 411 N.E.2d 936, 942 (1980) ("It does not follow ... that a price quotation which is not binding when accepted by a buyer but which becomes binding only if and when the buyer's purchase order is accepted by the seller, who is under absolutely no obligation to accept it, can by itself be treated as an offer.")

In the instant case, the terms and conditions included with Peebles' April 12, April 17 and August 16, 1974 quotation letters stated unequivocally that "Seller shall not be bound under any order placed by Buyer under the terms of this quotation unless and until such order by Seller is formally acknowledged and accepted in writing by one of Seller's authorized officers at its main office in Cleveland, Ohio." By incorporating this language into its proposal, Peebles' reserved unto itself the right to "back away"

---

**18.** Where there are no apposite California cases on point, this Court will follow and apply decisions applying the UCC under the law of states other than California, to the extent that those decisions are consistent with existing California caselaw and appear to reflect a well-reasoned application of the UCC that most likely would be followed by the California courts.

**19.** *See, e.g., Steiner v. Mobil Oil Corp.,* 20 Cal.3d 90, 141 Cal.Rptr. 157, 163, 569 P.2d 751, 757 (1977).

**20.** Restatement (Second) of Contracts § 24 (1981), *quoted in and relied upon in Corinthian Pharmaceutical Systems, Inc. v. Lederle Laboratories,* 724 F.Supp. 605, 609 (S.D.Ind.1989) (price quotation case); *Brown Machine,* 770 S.W.2d at 419 (same); *McCarty v. Verson Allsteel Press Co.,* 89 Ill.App.3d 498, 44 Ill.Dec. 570, 576, 411 N.E.2d 936, 942 (1980) (same). *See also Black's Law Dictionary* (4th ed.), *cited in McCarty,* 44 Ill.Dec. at 576, 411 N.E.2d at 942 ("an offer is an act on the part of one person whereby he gives to another the legal power of creating the obligation called contract"); 1 *Corbin on Contracts* 24–25, *cited in McCarty, supra* ("It is believed that the best short description ... is that an offer creates a power of acceptance in the offeree. It will not be disputed by any one that, after an offer is made, a voluntary expression of assent by the offeree is *all* that is necessary to create what we call contract.") (emphasis added).

from the proposal even if TDI issued a purchase order for the generators at the price and under the terms specified in the proposal. Peebles' preliminary correspondence therefore did not constitute an offer, because more than the assent of TDI was required to create a binding contract between the parties.[21]

■ The Court recognizes that the cases cited herein can be distinguished in some respects and that other, alternative grounds for decision were available to and referred to by the courts in the decisions. However, the rationale relied upon here is both crystal clear and independently applicable to this case. It is hornbook law that a proposal constitutes an offer only if the assent of the other party to the bargain is all that is needed to consummate the contract. *See* authorities cited in note 20, *supra; see also Restatement (Second) Contracts*, § 26 ("A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent."). Here, under the express terms and conditions of Peebles' quotation letters, it is clear that more than the assent of TDI was needed to consummate the contract. The quotation letters therefore did not constitute the "offer" in this case.[22]

■ As the quotation letters did not constitute the offer, Peebles cannot rely on subsection (2) of Section 2207 to exclude TDI terms and conditions that vary from the boilerplate terms and conditions of the Peebles quotation correspondence. The first document that satisfied the requirements of a common law offer was the November 13, 1974 TDI purchase order. Although Peebles objected to the terms and conditions of that offer, Peebles' efforts to obtain TDI's agreement to different contract terms were (to the extent relevant here) unsuccessful and Peebles ultimately accepted the terms and conditions of the TDI offer when it performed under the contract and furnished the generators requested by TDI. Thus, the terms and conditions of TDI's November 13, 1974 purchase order, as modified by the addendum and change orders issued by TDI, governed the contract between TDI and Peebles. Those contractual terms and conditions did not include either a waiver of warranties or a limitation upon recoverable damages. Peebles' defense based upon the presence of a waiver of warranties and limitations upon recovery of damages in the TDI–Peebles contract therefore must fail.

■ The TDI internal memorandum of February 24, 1975 does not support a justifiable inference that TDI agreed to Peebles' waiver and damage limitations during the negotiations that followed the issuance of TDI's purchase order. At the very outset, it should be noted that an internal memorandum does not a contract make. There is absolutely no indication in this record that TDI ever followed through on the internal memorandum and conveyed to Peebles an actual acceptance of Peebles' warranty, waiver and/or damage limitations provisions, either in whole or in part. Indeed, the communications surrounding the February 24, 1975 internal memorandum lead to exactly

21. *Accord Corinthian Pharmaceutical Systems, Inc. v. Lederle Laboratories*, 724 F.Supp. 605, 609 (S.D.Ind.1989) (quotation did not constitute an offer where, *inter alia*, all orders were subject to acceptance by the seller); *Brown Machine, supra* (quotation did not constitute an offer where, *inter alia* but "[m]ost importantly," the proposal expressly provided that "[n]o order, sale, agreement for sale, accepted proposal, offer to sell and/or contract of sale shall be binding upon [seller] unless accepted by [seller] ... on [seller's] standard 'order acknowledgment form' "); *Quaker State Mushroom, supra* (similar); *McCarty, supra* (similar); *see also Technographics, Inc. v. Mercer Corp.*, 777 F.Supp. 1214 (M.D.Pa.1991) (quotation that specified that no order would be binding until accepted by the seller's home office had no legal effect). The cases relied upon by Peebles are distinguishable in substance. For example, in *Mead Corp. v. McNally Pittsburg Mfg. Corp.*, 654 F.2d 1197 (6th Cir.1981), there is no indication in the opinion that the bidder's bid proposal contained language requiring the bidder's acceptance of the owner's purchase order as a prerequisite to contract formation and, further, the owner's purchase order expressly incorporated the terms of the bid proposal as part of the contract. *See* 654 F.2d at 1201–02 & n. 7, 1204, 1205 & n. 13.

22. *Cf. Technographics, Inc.*, 777 F.Supp. at 1216 ("Unfortunately for [seller], it took one too many steps in its efforts to protect its interests.").

the opposite inference. Peebles' Len Madison wrote to TDI on February 12, 1975 asking that TDI address seven items, including the incorporation of the terms and conditions of Peebles' quotation letters and adoption of the special warranty provisions proposed in Peebles' December 20, 1974 letter to TDI. Significantly, Madison wrote to TDI again on April 9, 1975, after the February 24, 1975 internal memorandum, stating that the seven items discussed in his February 12, 1975 letter "still need[ed] to be answered." After this April 9, 1975 letter, TDI issued an addendum and a change order that together addressed two of the seven points raised in the February 12, 1975 letter. However, there is absolutely no indication in the record presented to this Court, either documentary or testimonial, that reflects the incorporation of Peebles' proposed "standard warranty provision" into the TDI–Peebles contract. Rather, the only indication in the record is that TDI still had not accepted Peebles' proposed warranty language at the time that Peebles accepted the contract through its performance.

Moreover, the language of the February 24, 1975 TDI internal memorandum is, at best, ambiguous with regard to acceptance of all of the warranty terms and conditions proposed by Peebles. Although the internal memorandum states that "Ron Wood is to write to [Peebles] advising that the Warranty provisions attached to their letter dated 2/12/75 are acceptable for ... Gulf States," the internal memorandum further states that the four projects discussed therein "will have a one (1) year warranty from the date of commercial operation." The proposed Peebles standard warranty provision, however, provided for a warranty only for "one year from the initial equipment startup or 18 months from date of shipment, whichever occurs first." The internal memorandum therefore serves as much too slender of a reed to support a justifiable inference that TDI had assented to the warranty language proposed by Peebles, including the significant waivers of warranty and limitations upon recovery of damages contained therein.

■ Similarly, Moeller's November 23, 1977 letter for TDI to Stone & Webster does not support a justifiable inference that TDI had assented to Peebles' proposed "standard" warranty terms and conditions. The only issue addressed by Moeller in his letter is the potential requirements and costs that might be involved if extended warranties were requested on the generators. There does not appear to be any reason for enclosing a copy of the proposed Peebles' standard warranty provision with the November 23, 1977 letter other than the fact that this provision was on the same page as the proposed extended warranty provision that was discussed in Moeller's letter and which was furnished merely as an example.

Nor does the June 19, 1979 handwritten internal memorandum by TDI's C. Herrmann give rise to a justifiable inference that TDI agreed to Peebles' waiver and damage limitations during the negotiations that followed the issuance of TDI's purchase order. Again, an internal memorandum does not a contract make. And, as is noted above in the factual recitation, the handwritten memorandum hardly supports Peebles' position as it refers to an "extended" warranty period— one year from date of commercial operation—that is not found anywhere in any purported contract document relied upon by Peebles but, instead, is found only in TDI's original bid request and in its November 13, 1974 purchase order. The internal memorandum therefore does not support a justifiable inference that TDI agreed to Peebles' proposed warranty language.

In sum, it was TDI's November 13, 1974 purchase order, and not Peebles' prior quotation letters—which, by their own terms, did not allow a contract to be formed merely by an expression of assent by TDI—that constituted the offer in this case. Peebles' sought valiantly to have its provisions included within the contract with TDI but, in the end, Peebles accepted the terms and conditions of TDI's offer, as modified, when Peebles performed under the contract without first securing TDI's agreement to Peebles' requested terms and conditions. If Peebles truly had not wanted to be bound under the sales contract without an agreement by TDI to a waiver of implied warranties and limitation upon recovery of consequential damages, it

could have protected itself by not providing the generators until it obtained that agreement. *Cf. Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440, 1445 (9th Cir. 1986) ("If the seller truly does not want to be bound unless the buyer assents to its terms, it can protect itself by not shipping until it obtains that assent."). Indeed, Peebles could have walked away from the deal at any time prior to performance, as Peebles had reserved to itself the right to take the final step required for contract formation. As Peebles chose to perform without obtaining TDI's assent to its terms, Peebles must live with the terms and conditions of TDI's purchase order, which did not include terms waiving warranties or limiting the damages that may be recovered.[23]

At this point, Peebles would have the Court apply California law not only to the question of the content of the TDI–Peebles contract but also to the merits of GSU's underlying redhibition, implied warranty, products liability and negligence claims. Peebles contends in this vein that California does not recognize a redhibition claim as such, that any implied warranty claims are time-barred under California law and that the products liability and negligence claims are not viable claims under California law in this context.

■■■ The Court is not persuaded by Peebles' arguments in this regard. The Court

looked to California commercial law in this case solely because Peebles' contract-based defense to GSU's claims required resort to that State's commercial law to determine the content of a third party contract that had a substantial connection to California. The Court is not going to let the tail wag the dog in this case, however. GSU's underlying substantive claims in this case clearly arise under Louisiana law and clearly call for the application of Louisiana law for their resolution. GSU's redhibition and tort claims arise as a consequence of damages sustained in Louisiana due to the manifestation in Louisiana of alleged defects in equipment that indisputably had been manufactured and sold for use in Louisiana. Indeed, the express object of both the GSU–TDI and TDI–Peebles contracts was the supplying of equipment for installation and use in Louisiana. And, although the plaintiff, GSU, is a Texas corporation, GSU does substantial business in Louisiana, owns substantial assets in Louisiana, including the River Bend nuclear power plant, and has been supplying electrical service to the south Louisiana area for more than eighty years. Moreover, Louisiana has a substantial interest in the application of its law to this dispute as the controversy concerns the sale of emergency generators for a nuclear power plant that operates approximately thirty miles from the state capitol, such that the matters at issue involve the

---

**23.** Further, in the alternative, even if the writings of the parties were not sufficient to establish a contract, such that a contract arose only by virtue of the parties' performance, the provisions of that contract would be determined under subsection (3) of Section 2207. Under subsection (3), the contract would be composed of the terms upon which the parties' writings agree and the terms supplied by operation of law. As the parties' writings in this case do not agree on waiver of warranties and limitation of damages and as the UCC otherwise does not supply such terms by operation of law, Peebles' waiver and limitations provisions would not become part of the contract under Section 2207(3). *Accord Diamond Fruit Growers, Inc., supra.* Moreover, in the further partial alternative, even if the Peebles' quotation letters were regarded as the "offer," Peebles has conceded that the language contained therein is not sufficient to waive GSU's redhibition and/or implied warranty claims under Louisiana waiver law and the Court has substantial doubts about the sufficiency of the language for purposes of waiver under California law. And, under this

partial alternative view of the case, the Court still would be inclined to disregard the warranty language proposed later by Peebles in its December 20, 1974 correspondence, as there is no evidence that TDI actually accepted this proposed warranty language, such that only the language of the quotation letters would be controlling under Section 2207. Recovery of consequential damages on GSU's redhibition claim (but perhaps not its products liability and negligence claims, if viable) might be precluded under this alternative view of the case, however, as such language is included in the terms and conditions of the quotation letters, although GSU has sought to raise some doubt in this regard as well. At bottom, however, this Court holds that the November 13, 1974 TDI purchase order was the offer, that Peebles accepted the terms of this offer by performing under the contract, and that the contract therefore did not include terms waiving warranties and limiting recovery of consequential damages because such terms were not included in the TDI purchase order, as modified following negotiations between TDI and Peebles.

State's substantial interest in the safety of its citizens and the protection of its environment. Weighed against these factors and interests, the mere fact that the generators came to Louisiana by way of California does not suggest to this Court that California law should apply to GSU's claim in redhibition or to GSU's products liability and negligence claims. *See* La.Civ.Code art. 3537 (factors governing choice of law for conventional obligations); La.Civ.Code art. 3542 (factors governing choice of law for delictual obligations); La.Civ.Code art. 3545 (factors governing choice of law for products liability claims).[24]

Finally, Peebles contends that GSU's products liability and negligence claims are barred by the "economic loss" rule, which Peebles urges is applicable not only in California and the majority of States but in Louisiana as well. Under the economic loss rule, a tort claim will not lie where a commercial party alleges that a defect in the product caused injury only to the product itself and thereby caused a purely economic loss to the commercial party. *See, e.g., East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (federal admiralty law); *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965) (California law). The Court is not persuaded at this juncture, however, that the common law economic loss rule is applicable in Louisiana. The holdings of common law courts and of federal courts applying judge-made admiralty law[25] are not so easily transported into Louisiana's civil law system where the emphasis is more on legislative-made rather than judge-made law. Moreover, the Court would note that while the economic loss rule may reflect the majority rule in other states, it is by no means universally applicable in all of the common law states. *See generally East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. at 868–71, 106 S.Ct. at 2301–02.[26] Redhibition and tort remedies are complementary and coexisting remedies at least in some contexts under Louisiana law. *See, e.g., Philippe v. Browning Arms Company*, 395 So.2d 310, 318–19 (La.1981). The defendants ultimately may be able to build an argument that Louisiana courts would follow a rule akin to the economic loss rule upon the decision in *Young v. Ford Motor Co., Inc.*, 595 So.2d 1123 (La.1992), a case which the defendants have not relied upon or cited to the Court in this regard.[27] Yet, at this late stage in the proceedings, the Court will not entertain this un-briefed possibility any further, reserving to the defendants the right to make the argument post-verdict if necessary.

In closing, the Court would note that any contractual claim for breach of implied warranties herein necessarily is subsumed within GSU's redhibition claim. Under Louisiana law, there is no breach of implied warranty claim (other than the implied warranty against eviction) that exists apart from and outside of the warranty against redhibitory vices. *E.g., Holden v. Placid Oil Company*, 512 F.Supp. 644, 646 (E.D.La.1981). Accord-

---

**24.** There is no dispute in this diversity case that, under *Klaxon Co. v. Stentor Electric Mfg. Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), Louisiana choice of law principles govern. The Court reaches the same result under the Louisiana jurisprudence decided prior to the adoption of the Codal articles cited in the text. The decision in *Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc.*, 922 F.2d 220 (5th Cir.1991), is not controlling herein as the case involved an explicit contractual choice of Massachusetts law, any Louisiana law redhibition claim was waived by a waiver of "warranties, express or implied, including without limitation any warranties of merchantability or fitness for a particular purpose," and the limitations of damages clause in the Massachusetts law contract turned upon a distinction between ordinary and gross negligence, with the court finding the latter to be lacking on the facts of the case, such that the plaintiff could recover only limited damages in the case.

**25.** *See East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. at 864, 106 S.Ct. at 2299 ("Absent a relevant statute, the general maritime law, as developed by the judiciary, applies.").

**26.** *See also Capitol Fuels, Inc. v. Clark Equipment Co.*, 181 W.Va. 258, 382 S.E.2d 311 (W.Va.1989) (declining to follow *East River* on state law grounds).

**27.** The bankruptcy decision in *In re James Noel Flying Service, Inc.*, 61 B.R. 335 (Bankr.W.D.La. 1986), is not instructive as the bankruptcy court's analysis refers only to common law authorities such as *Seely* and the trustee, William C. Sandoz, did not in any event raise any serious dispute on the issue.

ingly, the claims that will go to the jury in this case shall be GSU's redhibition claim against Peebles under Louisiana law and GSU's Louisiana-law products liability and negligence claims, all without any restrictions based upon waiver of warranties or limitation upon recoverable damages.

## CONCLUSION

Accordingly, for the foregoing reasons, the motion for summary judgment filed by defendants Northern Engineering Industries and NEI Peebles Electric Products, Inc. on June 29, 1992 shall be DENIED to the extent that said defendants seek to rely upon waiver of warranties and limitation upon the damages that may be recovered and the motion for partial summary judgment filed by the plaintiff, Gulf States Utilities Company, on August 3, 1992 shall be GRANTED, such that the plaintiff is entitled to partial judgment in its favor striking the defendants' warranty waiver and damage limitation defenses.