United States Court of Appeals,

Fifth Circuit.

No. 91-4073

Summary Calendar.

AXELSON, INC., Plaintiff-Appellee,

v.

McEVOY-WILLIS, A DIVISION OF SMITH INTERNATIONAL (NORTH SEA), LTD.,
Defendant-Appellant.

Nov. 29, 1993.

Appeal from the United States District Court for the Eastern District of Texas.

Before DAVIS, JONES, and DUHÉ Circuit Judges.

DUHÉ, Circuit Judge:

This case presents classic battle-of-the-forms questions.[1] We must determine which of various

writings, if any, was an offer, which an acceptance, and the final terms of the perfected contract.

Understanding how the parties arrived at a contract must turn on an examination of the parties'

negotiations and conduct. We affirm, holding that the parties concluded a contract without agreeing

to a cancellation provision. The law fills in the gap left by the parties. Alternatively, the cancellation

provision in the initial quotation may have been part of the contract, but because that provision is

identical to the measure of contract damages under the general law, the result is the same.

## I. THE FACTS

The facts of this case sound like the delight of a contracts professor, if no one else. Statoil,

the Norwegian state oil company, planned to build oil rigs in the North Sea. McEvoy was to build

Christmas trees for the rigs, and Axelson was to supply McEvoy with actuators, an important part

of Christmas trees.[2] McEvoy was unable at the time to make actuators that would satisfy Statoil's

---

[1]*See generally* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 1-3 (3d
ed. 1988).

[2]A "Christmas tree" is a piece of equipment used on oil rigs. Christmas trees and actuators, for
present purposes, may be considered technically complex widgets.

requirements, but Axelson was.

In 1984 Axelson received an inquiry from Statoil about supplying it with the actuators. On July 12, Axelson sent a quotation, with all material terms, to McEvoy, with "note 18" stating that the quotation would remain valid for only 60 days. The "notes" were just enumerated terms and conditions. Note 20 required that Axelson approve any cancellations of orders accepted by Axelson and stated the usual common-law and U.C.C. formula for determining contract damages.[3] McEvoy asked that various notes, including note 18, be modified. McEvoy also stated in this telex, "We expect no notes, which will be considered as exceptions, to apply...." In "Revision 1," a subsequent telex, Axelson extended the validity of the quotation under note 18 for an additional 60 days, as McEvoy had requested. Later, in "Revision 2," Axelson extended the validity of the quotation until December 31, 1984.

The new year arrived and the parties had not yet concluded the contract, but they were getting closer. McEvoy pressured Axelson for data books so that the Norwegian government could approve the technical specifications. McEvoy's R.W. Clarke stated in a telex to Axelson,

> ... I am continually being pressed for the drawings and data enabling a design review to be done....
>
> ... I do ask you proceed immediately as you have my sincerest assurance that the P.O. will be placed just as soon as I can tie up one or two items.
>
> Please confirm you will proceed and let me have a date when you can send same.
>
> Thank you in advance.

Axelson, however, refused to furnish data books until McEvoy placed an order.

On March 7, McEvoy sent its "telex of intent for commencement of our purchase order number P 62675." The "official purchase order [was] to follow in due course." The telex of intent stated the object, quantity, price, and delivery terms for the contract, with the prices subject to escalation as agreed. It also required the data books within eight weeks. Axelson apparently expressed reluctance to provide the data books without an official order, but Axelson received further

---

[3]Cancellation was conditioned on "terms which will indemnify Axelson against loss or damage occasioned by such cancellation."

assurances from Mr. Clarke, via Axelson's London agent. On March 8, Axelson sent a telex to McEvoy saying that the data books would be issued within eight weeks. Axelson thus began performance, and the books were sent May 2 with an invoice to follow.

Not until June 4 did McEvoy actually send its form purchase order to Axelson. The order, in fine print, stated,

> Acceptance of the offer represented by this order is expressly limited to the provisions overleaf. Acceptance of this order shall be constituted on the receipt by the buyer of the acknowledgement copy of this order (attached hereto) duly signed or in any event delivery in whole or in part of the articles described. This is the entire contract and no changes of any kind whatsoever are binding on buyer nor shall any counter offers be deemed to be accepted by buyer unless they are in writing and signed by an authorized representative of buyer's purchasing department.[4]

The overleaf included the following cancellation provision:

> TERMINATION: Without prejudice to any other right or remedy of Buyer, Buyer shall have the right to terminate this order (1) in respect of any article at any time prior to their delivery or performance, by written notice, cable or telex provided that the Buyer shall pay a fair and reasonable price for work in progress at the time of such notice and subsequently received by Buyer provided that Buyer shall not be liable for any loss or damage suffered by Seller including consequential loss or damage.[5]

Axelson manufactured and delivered 28 actuators, and McEvoy paid for them. Then Axelson manufactured eight more, and they were ready for shipment, when McEvoy withdrew from the contract. Forty more actuators remained to be built under the contract.

Axelson sued McEvoy for breach of contract, tortious interference with contract, fraud, breach of the duty of good faith and fair dealing, wrongful appropriation of trade secrets, and promissory estoppel. The trade-secrets claim was settled during the bench trial. Chief Judge Justice found that Axelson's cancellation provision was part of the contract because it was contained in the original quotation, which the parties continued to reference throughout their negotiations. He also found that the original quotation was an offer whose expiration date was extended orally, and that both parties treated the quotation as a valid offer. Judge Justice concluded that McEvoy breached the contract by cancelling, and he awarded damages of $684,905.29 plus interest. He rendered

---

[4]The punctuation in this paragraph is illegible on the copy in the record. This Court has guessed where the periods are in the original.

[5]Again, this Court has added the punctuation because it is illegible in the record.

judgment for McEvoy on the remaining claims. McEvoy appealed the judgment of breach of contract. Axelson cross-appealed on the other claims but later dismissed its cross-appeal.

The facts given above are not disputed and they are all we need to resolve the case.

## II. THE LAW

In the district court, the parties argued extensively about whether to apply English law or Texas law. The opinion of the district court rests primarily on Texas law, but it decided that the results would be the same under English law. McEvoy has not briefed the issue and is considered to have abandoned it. *Villanueva v. CNA Ins. Cos.,* 868 F.2d 684, 687 n. 5 (5th Cir.1989); *Harris v. Plastics Mfg. Co.,* 617 F.2d 438, 440 (5th Cir.1980). Axelson seems content for Texas law to be applied. This Court, therefore, will apply Texas law.

The parties agree that the applicable Texas substantive law is the Texas equivalent of the U.C.C. article on sales. The subchapter on "Form, Formation and Readjustment of Contract" will inform most of our analysis. *See generally* Tex.Bus. & Com.Code Ann. §§ 2.201-.210 (West 1968 & Supp.1991).

## III. THE ANALYSIS

Under the Code, "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.... even though the moment of its making is undetermined." *Id.* § 2.204(a)-(b). In the present case, it is hard to tell exactly when the contract was perfected. The quotation from Axelson can be construed as an offer. An offer is an act that leads the offeree reasonably to believe that assent (i.e., acceptance) will conclude the deal. *E.g., Mid-south Packers, Inc. v. Shoney's, Inc.,* 761 F.2d 1117, 1121 (5th Cir.1985). The telex quotation of July 12, 1984, which contained all material terms, lapsed on December 31, but ongoing negotiations between the parties show that the terms of the quotation, after being modified by negotiation, were still subject to McEvoy's acceptance. If at any point in the negotiations McEvoy had sent a telex saying, "We accept," the contract would have been concluded on the terms as negotiated to that point. McEvoy's telex of intent was the definite and seasonable acceptance and perfected the contract. *See* Tex.Bus. & Com.Code Ann. § 2.207(a) (West 1968).

There is one problem with this analysis. Axelson's cancellation provision states, "Orders *accepted by Axelson, Inc.* are not subject to cancellation or alterations by customers except with the consent of Axelson...." (Emphasis added). McEvoy argues that this language means that Axelson had to accept an order before a contract could be concluded. Then the quotation could not be an offer; it would only be an invitation for an offer. These words may just mean, however, that if Axelson has taken no affirmative act to accept, then the customer can still cancel the order without Axelson's consent. In that case, this language would present no problem.

Even if McEvoy is correct, though, it cannot reach the result it wants. The quotation would not be an offer, but the terms on which McEvoy was invited to make its offer were still clear enough. McEvoy made its offer by its telex of intent, asking for immediate preparation of the data books that Axelson until then had refused to compile. Axelson telexed back that it would start work and send the data books as requested. McEvoy had made its offer, and Axelson accepted. Under either analysis, the contract was concluded by the middle of March 1985. Both parties understood that they had a contract; they celebrated, and they commenced performance. Conduct by both parties recognized the existence of a contract.

McEvoy argues that too much weight is being given to its telex of intent. But the very case McEvoy cites states that a letter of intent can be a contract itself. *Garner v. Boyd,* 330 F.Supp. 22, 25-26 (N.D.Tex.1970), *aff'd per curiam,* 447 F.2d 1373 (5th Cir.1971). The telex of intent included no cancellation term, so either Axelson's term or the general law would apply. They are the same.

That the telex of intent said the form purchase order was to follow in due course does not avail McEvoy. Because the parties had a meeting of the minds months before, the additional terms on the June form purchase order never became part of the contract. *Migerobe, Inc. v. Certina USA, Inc.,* 924 F.2d 1330, 1335-36 (5th Cir.1991) (Mississippi U.C.C.).

The result is no different even if the writings of the parties did not constitute a contract. The drafters of the U.C.C. had this situation in mind when they wrote subsection 2.207(c):

> Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any

other provisions of this title.

The conduct of the parties here recognizes the existence of a contract. The parties' writings do not agree on a particular cancellation provision, so the law provides one. *See id.* §§ 2.207, 2.703, 2.708.[6]

Regardless of which of the above approaches we take, the result is the same. The finding of damages for the principal amount is therefore affirmed.

## IV. INTEREST AND ATTORNEYS' FEES

Texas law allows a prevailing party to collect prejudgment interest in contract cases "in all but the most exceptional circumstances." *Campbell, Athey & Zukowski v. Thomasson,* 863 F.2d 398, 402 (5th Cir.1989) (citing Texas cases). No such circumstances have been shown here, so only the rate needs to be determined. When the interest award is based on equity, the rate under article 5069-1.05 applies. *Law Offices of Moore & Assocs. v. Aetna Ins. Co.,* 902 F.2d 418, 422 (5th Cir.1990) (citing *Perry Roofing Co. v. Olcott,* 744 S.W.2d 929 (Tex.1988); *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985)). The rate under that article for the time in question is ten percent. *See* Tex.Rev.Civ.Stat.Ann. art. 5069-1.05 (West 1987).

McEvoy argues that the interest rate should be determined under article 5069-1.03, which mandates a rate of six percent "on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable." Tex.Rev.Civ.Stat.Ann. art. 1.03 (West 1987). If the contract does not "unambiguously[ ] establish the amount owed," article 5069-1.05 applies, however. *Moore,* 902 F.2d at 421 (quoting *Campbell,* 863 F.2d at 402); *Lubrizol Corp. v. Cardinal Constr. Co.,* 868 F.2d 767, 771-72 (5th Cir.1989).

The issue, then, is whether the contract unambiguously establishes the amount owed. It does not. Under our analysis, either the general law or Axelson's cancellation provision establishes the

---

[6]The statute of frauds does not present a problem. The statute only requires (1) "some writing sufficient to indicate that a contract for sale has been made," (2) a signature (in a loose sense), and (3) a quantity term. "All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction." Tex.Bus. & Com.Code Ann. § 2.201(a) & cmt. 1 (West 1968). There can be no dispute that the writings, although they may not form a contract themselves, indicate that a contract for sale was made. The concerns of the statute of frauds are different from those of § 2.207, and the situation that the statute of frauds protects against is not present here. *See Tri-State Petroleum Corp. v. Saber Energy, Inc.,* 845 F.2d 575, 579 (5th Cir.1988).

amount owed. Because Axelson's cancellation provision uses the same measure as the law would, even giving article 1.03 its broadest possible reading, the contract does not indicate the amount owed. The court had to determine that amount, employing general legal concepts. This contract is not within the contemplation of article 1.03.

McEvoy also contends that the Texas Constitution prohibits a rate of ten percent, citing article XVI, section 11. That section applies only to lending and credit transactions and is inapplicable to the rate of prejudgment interest set by a court. *Sage St. Assocs. v. Northdale Constr. Co.,* No. D-1349, --- S.W.2d ----, ----, 1993 WL 233410 at *3, 1993 Tex. LEXIS 103, at *7 (June 30, 1993). The one case that McEvoy cites for support of its argument was disapproved by the *Sage Street* court. *Id.* at ---- n. 3, 1993 WL 233410 at *10 n. 3, 1993 Tex. LEXIS 103 at *7 n. 3. The Texas Supreme Court has held that the rate provided in article 5069-1.05 should be used in contract cases in which the interest award is based on equity, and we follow the Texas Supreme Court.

McEvoy further complains that the district court has erred in computing the date for commencement of interest accrual and the compounding method. McEvoy is looking at the wrong section of the statute; it cites the section "wrongful death, personal injury, and property damage." Tex.Rev.Civ.Stat.Ann. art. 5069-1.05 § 6 (West Supp.1991). Section 2, which applies to judgments in general, applies to this contract case. The district court was correct in determining the date that interest began to accrue and the compounding method. The award of interest at ten percent is therefore affirmed.

McEvoy, in a footnote, questions the district court award of attorneys' fees. McEvoy only argues that the fees award should be reversed because the entire district court decision should be reversed. Because we affirm that McEvoy breached by withdrawing from the contract, this argument does not apply. Because McEvoy does not press any other theory for reversal of the fees award, it and the rest of the judgment of the district court are

AFFIRMED.