United States Court of Appeals,

Fifth Circuit.

No. 94-20189.

GLOBAL PETROTECH, INC., Plaintiff-Appellee,

v.

ENGELHARD CORPORATION, Defendant-Appellant.

July 19, 1995.

Appeal from the United States District Court for the Southern District of Texas.

Before KING, GARWOOD and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

Engelhard Corporation ("Engelhard") appeals the district court's final judgment and order overruling it's motions for judgment as a matter of law, for new trial and to alter judgment arising from the jury trial of claims brought by Global Petrotech, Inc. ("Global") under the Texas Deceptive Trade Practices Act ("DTPA"). After the jury answered all special interrogatories in favor of Global, the district court entered a final judgment awarding Global $351,156.22 in compensatory damages, $500,000.00 in exemplary (punitive) damages, prejudgment interest at 10%, postjudgment interest at 3.74%, attorneys fees and costs. We vacate the award of punitive damages, and remand for new trial on that issue.

## I. BACKGROUND

In August 1990, Global, a small Houston trading company that purchases goods for resale and export to customers in China, was contacted by China Technical Corporation ("CTC"), a subsidiary of

China National Technical Import & Export Corporation ("CNTIC"), to obtain a quote for palladium chloride from Engelhard. Global related CTC's specification to an Engelhard customer service representative on August 3, 1990. In that request, Global inquired about the price and the terms of purchasing 170 kilograms of palladium chloride with a palladium content between 59.5% and 60.5%. Global also informed Engelhard that it was inexperienced in handling precious metal commodities like palladium. Engelhard's response quoted a price for "Palladium Chloride solution red-brown powder, hygroscopic, soluble in dilute HC1, 60% PD content (theoretical)." The quote was erroneous in that it identified a solution of palladium chloride with 60% palladium, which does not exist. Palladium chloride solution manufactured by Engelhard only contains 10% or 20% palladium.

Because Global was unfamiliar with palladium chloride, it did not realize that Engelhard's quote was incorrect. On October 24, 1990, Global sent Engelhard a purchase order for 170 kilograms of palladium chloride solution containing 60% palladium, with 3279.373 troy ounces of palladium as the amount of palladium required to fabricate the goods. Global then wire-transferred $316,459.49 to Engelhard as advance payment for the order.

In December 1990, Engelhard shipped the palladium chloride order directly to CTC. After receiving the shipment, CTC notified Global that the product was incorrect; CTC received 510 kilograms of palladium chloride solution containing only 20% palladium rather than palladium chloride containing a concentration of 60%

2

palladium.[1] Global then contacted Engelhard about CTC's receipt of 20% palladium instead of 60%. On January 4, 1991, Engelhard requested Global to find out whether CTC could use the palladium chloride solution, and that, if CTC could not, CTC should return the shipment to Engelhard to be reprocessed into palladium chloride containing a concentration of 60% palladium.[2]

On January 11, 1991, Global informed Engelhard that CNTIC would be returning the palladium chloride solution to Engelhard, requested that Engelhard provide Global with the name of Engelhard's shipping agent in Beijing for delivery of the shipment and requested that Engelhard reimburse CNTIC for all direct out-of-pocket costs incurred relating to CNTIC's handling of the shipment.[3]

After Engelhard informed Global that it did not have a shipping agent in Beijing, CNTIC shipped the palladium chloride solution back to the United States via an Air China flight from Beijing to JFK airport in New York. CNTIC had procured $521,566.80 in insurance on Global's behalf from the Peoples' Insurance Company

_____

[1]The shipment did, however, contain 3279.373 troy ounces of palladium. The difference between the quantity of palladium chloride shipped (510 kilograms) and the quantity ordered (170 kilograms) was due to the specification in the purchase order for 3279.373 troy ounces of palladium; 170 kilograms of palladium chloride solution would have required only 1093.11 troy ounces of palladium.

[2]Engelhard also noted that the shipping and refabrication would be completed at no additional charge to Global.

[3]Engelhard later agreed to pay for the shipping charges necessary for shipping the palladium chloride solution back to Engelhard's facilities, but requested documentation of any additional costs.

3

of China ("PICC") to cover the return shipment.[4]

When the return shipment of palladium chloride solution arrived at JFK airport, it was placed in an airport warehouse. Sometime later it was lost or stolen by an unknown third party.

When it was determined that the return shipment could not be located, Global requested a new shipment from Engelhard in late March 1991. Engelhard did not refund the $316,459.49 that Global paid for the first shipment, and agreed to send a second shipment only if Global paid Engelhard in advance, or provided a letter of credit in advance, for the cost of the palladium needed to fabricate another shipment. Global protested, complaining about Engelhard's demand for a higher per ounce price for the second shipment of palladium than charged for the first shipment.

Nonetheless, on April 19, 1991, Global wire-transferred to Engelhard $321,378.26 as payment in advance for the palladium used to fabricate the replacement shipment of palladium chloride. Then on April 29, 1991, Engelhard shipped 170 kilograms of palladium chloride containing a concentration of 60% palladium to CNTIC in Beijing.

CNTIC subsequently filed a claim for insurance proceeds for the lost shipment of palladium chloride solution with PICC. CNTIC assigned its rights under the policy to Global. Global and PICC executed a release agreement on July 30, 1992 specifying that Global promised to release PICC of all liability regarding the

---

[4]The total dollar amount of the insurance covered the price CNTIC contracted to pay Global ($521,566.80) for the shipment of palladium chloride.

4

insurance for loss, and that PICC would pay Global the sum of $260,000.00.

On January 29, 1992, Global filed suit against Engelhard in Texas state court alleging breach of contract, breach of warranty and violations of the DTPA. Engelhard removed the suit to federal court. On February 1, 1993, the district court ordered the parties to file written arguments on the issue of Engelhard's claim for a credit for the insurance proceeds received by Global. After the parties filed their memoranda, the court ruled that the insurance proceeds would count in reducing a damage award to Global based on the breach of contract claim.[5] The court noted, however, that under Texas law the collateral source rule applies to DTPA claims and therefore, the insurance proceeds would not be applied to an award for Global under the DTPA claim.

In the first amended pretrial order, Global dropped all but its DTPA claims against Engelhard. Global's two DTPA claims stemmed from Engelhard's quote to Global misrepresenting the characteristics of palladium chloride that led to Engelhard shipping an incorrect concentration of palladium in violation of sections 17.46(b)(5) and (7) of the Texas Business & Commerce Code ("the Code"), and Engelhard's unconscionable act of retaining Global's purchase money and refusing to supply replacement palladium chloride without additional charge after the first shipment was lost in violation of section 17.50(a)(3) of the Code.

---

[5]*Global Petrotech, Inc. v. Engelhard Corp.,* 824 F.Supp. 103, 104 (S.D.Tex.1993).

5

Additionally, Global sought punitive damages for Engelhard's "knowing" engagement in an unconscionable course of action, defined in section 17.45(9) of the Code.

At the final pretrial conference, Engelhard's counsel did not dispute that Global rejected the first palladium chloride solution shipment as nonconforming. Thus, the district court ruled that under Texas contract law the first shipment was at all times the property of Engelhard. The court also excluded all evidence of the insurance proceeds received by Global, even on the issue of unconscionability.

During the jury trial, the district court instructed the attorneys that, on the issue of who owned the first shipment of palladium chloride solution after it left Engelhard's possession, "no further questioning should be done about Engelhard's belief or knowledge of risk of loss, or the consequences of the loss, and how that formed their policy." In answering the special interrogatories, the jury found that Engelhard engaged in a false, misleading, or deceptive act that caused damage to Global, and that Engelhard engaged in an unconscionable course of action. Moreover, the jury found that Engelhard's unconscionable course of action was "knowingly" committed. The jury awarded Global $351,156.22 in actual damages and $500,000.00 in punitive damages. On February 8, 1994, the district court entered final judgment against Engelhard; including prejudgment interest on the actual damages at the rate of 10%, attorneys' fees, and postjudgment interest.

## II. EXCLUSION OF EVIDENCE

6

We will not reverse a district court's evidentiary rulings unless they are erroneous and substantial prejudice results. The burden of proving substantial prejudice lies with the party asserting error. *F.D.I.C. v. Mijalis,* 15 F.3d 1314, 1318-19 (5th Cir.1994). Where, however, "the admissibility determination necessarily involves a substantive legal decision," we engage in a two-tiered review process. *Stokes v. Georgia-Pacific Corp.,* 894 F.2d 764, 767 (5th Cir.1990). First we conduct a *de novo* review of the underlying legal analysis. *Id.* Second, we examine the evidentiary ruling for abuse of discretion. *Id.*

A. *Mistaken Belief as to Ownership*

Punitive damages are proper under the DTPA; "[i]f the trier of fact finds that the conduct of the defendant was committed knowingly, the trier of fact may award not more than three times the amount of actual damages." TEX.BUS & COM.CODE ANN. § 1750(b) (Vernon Supp.1995). Under the DTPA, "knowingly" is defined as "actual awareness of the falsity, deception, or unfairness of the act or practice giving rise to the consumer's claim." TEX.BUS. & COM.CODE ANN. § 17.45(9) (Vernon 1987).

Engelhard argues that the district court abused its discretion by excluding evidence of its belief that the first shipment of palladium chloride solution belonged to Global once it was delivered to CTC. Engelhard avers that it does not seek to offer the evidence of its purportedly "mistaken" belief as a defense to Global's DTPA claim, but, rather, to prove its state of mind at the time it allegedly engaged in an unconscionable course of action.

7

The district court erred, according to Engelhard, by not allowing Engelhard to offer evidence for the limited purpose of its good faith mistake of law to prove that its actions were not "knowingly" unconscionable, as defined under the DTPA, to warrant the imposition of punitive damages.

Under Texas law, it is clear that intent is not an element of § 17.50(a)(3), which prohibits any unconscionable action. *See Miller v. Soliz,* 648 S.W.2d 734, 738 (Tex.App.1983). Thus, for the underlying liability in a DTPA claim brought for committing unconscionable acts, "[t]he defense of good faith and/or bona fide error is not available." *Id.* at 739. Nevertheless, in light of the knowing conduct that must be found in order to allow a recovery for punitive damages under the DTPA, evidence with regard to Engelhard's state of mind or belief about the falsity, deception, or unfairness of its acts is clearly relevant to whether it acted knowingly. The question we must address is whether the exclusion of the evidence of Engelhard's mistaken belief resulted in substantial prejudice. *Mijalis,* 15 F.3d at 1318-19.

Our review of the record indicates that Engelhard's evidence of mistaken understanding of Texas contract law, which led to its mistaken belief that Global still owned the first shipment of palladium chloride solution that was rejected as nonconforming, is highly relevant to a determination as to whether Engelhard violated the DTPA "knowingly." Engelhard would have offered testimony from its employees regarding their belief that Global owned the first shipment of palladium chloride solution, and how that mistaken

8

belief affected their handling of Global's request for a second shipment. Specifically, Engelhard would have argued that it would not have charged Global for the second shipment of palladium chloride if it had known that it owned, and was responsible for, the first shipment.[6] Testimony about Engelhard's mistaken belief could have a substantial impact on the jury's determination as to whether Engelhard possessed the requisite state of mind to commit its violation of the DTPA "knowingly." If the jury concluded that Engelhard believed, although mistakenly, that Global owned the first shipment of palladium chloride solution and was responsible for shipping it back to Engelhard, then they could have reasonably concluded that the charge for the second shipment of palladium chloride was not made with actual awareness of its falsity, deception, or unfairness. Because we conclude that the exclusion of the evidence of Engelhard's mistaken belief did have a substantial impact on the jury's determination on the issue of punitive damages, we find the error was sufficiently prejudicial to effect Engelhard's substantial rights so as to require a new hearing on the issue of punitive damages. *See Brown v. Miller,* 631 F.2d 408, 413 (5th Cir.1980).

B. *Insurance*

---

[6]Although Global contends that the jury did hear testimony from Engelhard's manager, who stated in response to the district judge's questions that "it was my belief that the first shipment belonged to Global," the judge's immediate instruction to the jury limited the effect of that testimony. Thus, we can not conclude that the substance of the desired testimony was ever presented to the jury. *See United States v. Ashley,* 555 F.2d 462 (5th Cir.), *cert. denied,* 434 U.S. 869, 98 S.Ct. 210, 54 L.Ed.2d 147 (1977).

"The collateral source rule precludes a tortfeasor from obtaining the benefit of payment conferred upon the injured parties from sources other than the tortfeasor." *Jones v. Red Arrow Heavy Hauling, Inc.,* 816 S.W.2d 134, 136 (Tex.App.—Beaumont 1991) (citing RESTATEMENT (SECOND) OF TORTS § 920A). Its theory is that the wrongdoer should not receive the benefit of insurance independently obtained by the injured party. *Brown v. American Transfer & Storage Co.,* 601 S.W.2d 931, 934 (Tex.), *cert. denied,* 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474 (1980) (citation omitted). "Evidence that the injured party received benefits from a collateral source is inadmissible under the rules of relevancy." *Id.* (citing *Martinez v. RV Tool, Inc.,* 737 S.W.2d 17 (Tex.App.—El Paso 1987), *writ denied,* 747 S.W.2d 379 (Tex.1988)).

Engelhard contends that the district court erroneously excluded evidence based on the collateral source rule regarding Engelhard's belief that Global would be fully compensated by insurance for the lost first shipment of palladium chloride solution. Engelhard further argues that even if the collateral source rule applies to the insurance policy, the evidence that Engelhard believed that Global would be fully compensated by the insurance proceeds had probative value to show that Engelhard lacked the requisite state of mind to warrant the imposition of punitive damages under the "knowing" requirement relating to engaging in an unconscionable course of action. Engelhard contends that presenting this evidence to the jury, for the limited purpose of rebutting the "knowing" requirement for punitive damages, would

10

result in little prejudice.

For the collateral source rule to apply, the source of the benefit must truly be "collateral." *See Phillips v. Western Co. of North America,* 953 F.2d 923, 929 (5th Cir.1992). Generally, the rule does not apply when the tortfeasor has paid for the plaintiff's collateral benefit. "[T]he "essence' of the rule has been described as the independence of the transaction giving rise to the collateral source." *Id.* at 931 (citation omitted). However, the rule may not also apply even in situations where the tortfeasor does not directly pay for the benefit. "Application of the collateral source rule depends less upon the source of the funds than upon the character of the benefits received." *Haughton v. Blackships, Inc.,* 462 F.2d 788, 790 (5th Cir.1972) (citation omitted). Thus, the rule excluding evidence of a collateral source does not apply if the intended beneficiary of the collateral source is the tortfeasor.

In the pretrial joint admission of facts, Engelhard agreed that CNTIC procured an insurance policy, on Global's behalf, to cover the return of the first shipment of palladium chloride solution. Yet Engelhard has offered no evidence to show that the insurance policy was meant to benefit it in any way. Therefore, we find that the district court properly determined that the insurance was a collateral source.

However, the collateral source rule does not require in all circumstances that the collateral benefit (insurance) be excluded from the evidence introduced at trial. *See Phillips,* 953 F.2d at

11

934.  A narrow exception to the rule allows the admission of collateral source evidence in certain circumstances:

> If there is little likelihood of prejudice and no strong potential for improper use, and a careful qualifying jury instruction is given, then [a collateral source] may be admissible for the limited purpose of proving another matter.

*Simmons v. Hoegh Lines*, 784 F.2d 1234, 1237 (5th Cir.1986).

The very crux of Global's claims is that it was harmed by Engelhard's action in misrepresenting the character of the first shipment of palladium chloride solution and forcing Global to pay for the second shipment in advance.  The "knowing" aspect of the required second payment formed the basis for Global's punitive damages claim.  We find that evidence of Engelhard's belief that Global would be compensated by the insurance policy purchased by CNTIC is directly relevant to the issue of an "actual awareness" of unfairness.  Such evidence is relevant both to a factfinder's decision to award punitive damages and the amount thereof.  On the other hand, evidence of Global's insurance benefits, or Engelhard's belief in the existence of such benefits, might allow the jury to infer that Global was not damaged and does not deserve compensation for DTPA violations.  The suggestion made here is that the limiting instruction would confine the evidence to its proper use on the issue of punitive damages.

We need not, however, in this proceeding determine whether the district court abused its discretion in not allowing the proffered evidence with a qualifying jury instruction.  Inasmuch as we have previously determined (in Part II.A. of this opinion) that a remand is necessary for a retrial on punitive damages, suffice to say we

12

see little, if any, undue prejudice from such evidence in a subsequent proceeding in which ordinary liability and non-punitive damages have already been determined.

### III. PREJUDGMENT INTEREST

Engelhard contends that the district court erroneously followed article 5069-1.05 of the Texas Revised Civil Statutes in applying a ten percent interest rate in computing prejudgment interest. Engelhard argues instead that the six percent interest rate set forth in article 5069-1.03 is applicable because all of Global's claims arise out of Engelhard's alleged failure to perform and/or honor its contractual obligations.

Article 5069-1.03 limits prejudgment interest in certain contract cases to six percent.[7] "For article 5069-1.03 to apply, the case law suggests that we must look to the surface of the contract and see a visible perimeter encircling the prescribed contractual liability." *Atchison, Topeka and Santa Fe Railway Co. v. Sherwin-Williams Co.,* 963 F.2d 746, 751-52 (5th Cir.1992). However, if the contract fails to "unambiguously establish the amount owed," then article 5069-1.05 applies. *Law Offices of Moore & Associates v. Aetna Ins. Co.,* 902 F.2d 418, 421 (5th Cir.1990)

---

[7]The statute provides in pertinent part:

> When no specific rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable.

*Tex.Rev.Civ.Stat.Ann.* art. 5069-1.03 (Vernon 1987).

13

(quoting *Campbell, Athey & Zukowski v. Thomasson,* 863 F.2d 398, 402 (5th Cir.1989)).

We find the contracts between Engelhard and Global are not within the contemplation of article 5069-1.03. Neither the contract for the first shipment of palladium chloride solution nor the second contract for the second shipment of palladium chloride state with any specificity any measure of liability and amount owed. *See Axelson, Inc. v. McEvoy-Willis, a Div. of Smith Intern. (North Sea), Ltd.,* 7 F.3d 1230, 1234 (5th Cir.1993). Both contain only a description of the product, order quantity, per unit price and merchandise total. The total "sum payable" in damages is not fixed by either contract. Therefore, the district court was correct in applying a ten percent interest rate in accordance with article 5069-1.05.

## CONCLUSION

For the reasons articulated above, we VACATE the jury's award of punitive damages, and REMAND for a new trial solely on Global's claim for punitive damages under the DTPA. The judgment of the district court is otherwise AFFIRMED.