IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

―――――――――――――――

No. 94-41228

―――――――――――――――

CREST RIDGE CONSTRUCTION GROUP, INC.,

Plaintiff-Appellee,

versus

NEWCOURT INC.,

Defendant-Appellant.

―――――――――――――――

Appeal from the United States District Court
for the Eastern District of Texas

―――――――――――――――

February 26, 1996

Before HIGGINBOTHAM, EMILIO M. GARZA, and BENAVIDES, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

This diversity case concerns a dispute between a subcontractor and a supplier. The supplier appeals, on the grounds of sufficiency of the evidence, a jury verdict awarding the subcontractor damages for breach of contract. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

I

In 1989, two brothers, John and Joseph Brower, formed a company called Crest Ridge Construction Group, Inc. and sought to enter the construction business. Previously, the Browers had

brokered construction deals through a company called J.B. & Associates.

In early 1990, Taylor Woodrow Construction Co., a general contractor, awarded a subcontract to Crest Ridge for certain portions of the construction of the Liberty Science Center in Jersey City, New Jersey. One portion of the subcontract required Crest Ridge to supply architectural wall paneling for the Center. The Browers began discussions with Newcourt, Inc., a former client of J.B & Associates that supplied relatively low-cost foam paneling. The Browers succeeded in gaining Taylor Woodrow's approval for the use of Newcourt's foam paneling in the construction of the Center, and the parties began to exchange information detailing the requirements for the paneling job.

In late October, 1990, Newcourt issued a price quotation to J.B. & Associates of $758,000 to supply the necessary paneling. The price quotation was made "subject to credit department approval." Four days later, John Brower wrote to Newcourt requesting that Newcourt issue a quotation to the name of Crest Ridge and that Newcourt make further clarifications regarding the details of the job. The record contains no subsequent price quotation in the name of Crest Ridge. It does, however, contain two "add-ons," modifications to the price quotation reflecting changes in Newcourt's understanding of the job specifications, issued from Newcourt to Crest Ridge. These add-ons increased Newcourt's price quote to $760,000.

2

On November 7, 1990, Crest Ridge sent Newcourt a completed credit application form reciting that Crest Ridge had been established in 1985 and listing one banking and four trade references. That same day, Newcourt contacted Crest Ridge's banking reference and discovered that Crest Ridge had opened an account early in 1990 bearing an average balance of $5000. Newcourt also contacted Crest Ridge's trade references. One wrote back on November 20, stating, "No knowledge of this account-perhaps we dealt with them under a different name." On December 3, a second responded, "No a/c. Please supply a/c #." Newcourt did not hear from the other references.

Newcourt began investigating other methods of guaranteeing payment. The record includes contradictory information regarding the results of this investigation. In January, 1991, Newcourt contacted an attorney in New Jersey about the possibility of placing a lien on the Liberty Science Center property. Calvin Court, president of Newcourt, testified that in January or February, 1991, he knew that Newcourt could place a lien on the property. In contrast, a letter from Newcourt to Crest Ridge dated February 8, 1991 stated that the property search "raised questions." This letter reiterated a request made on January 25 for either a copy of a payment bond protecting Newcourt or sufficient information allowing Newcourt to secure a copy of such a bond on its own. One month later, Crest Ridge faxed Newcourt the name and address of Crest Ridge's bonding company. Newcourt did not contact the bonding company. John Brower testified that Crest

Ridge sent Newcourt a copy of a bond guaranteeing Taylor Woodrow's payment to Crest Ridge late in 1990, but Crest Ridge did not introduce a copy of this correspondence or the bond into evidence. In early March, Newcourt contacted American Credit Indemnity Company and was unable to purchase accounts receivable insurance from that company. The record includes no information about the specifics of this communication between American and Newcourt.

Meanwhile, the parties continued to exchange information. On January 4, 1991, Crest Ridge issued a purchase order to Newcourt quoting a price of $760,000 and referencing Newcourt's original price quotation and its two add-ons. The record includes a flurry of letters from October, 1990 to March, 1991 between Crest Ridge and Newcourt concerning the details of the project. Newcourt supplied samples of its wall paneling material, job specifications and calculations, three revisions of shop drawings, and final drawings showing where each panel would be placed at the Center. Crest Ridge and Newcourt had extended discussions over coils and over the strength of wall paneling fasteners. Newcourt was to make the first shipment of wall paneling later in 1991.

Testimony at the trial established certain customs and practices in the construction industry. First, the industry considered a purchase order issued in response to a price quotation as a binding event. Second, construction companies presumed that a supply contract without payment terms would proceed according to a standard schedule. According to this schedule, the supplier billed the subcontractor by the 25th of the month and could expect

4

payment by the tenth of the second month thereafter.  This 45-day interval allowed a bill to travel from the subcontractor to the general contractor to the owner, and for payment to return from the owner to the general contractor to the subcontractor to the supplier.

On March 25, 1991, Newcourt wrote to Crest Ridge suspending all further work on the wall paneling project and demanding payment in full by April 5.  The letter did not mention credit problems; it gave as Newcourt's reasons for demanding full payment  "the encumbering and confusing progress and lack of receiving pertinent data necessary to satisfy the requirements on the above-referenced project."[1]  In response to the March 25 demand letter, Crest Ridge attempted several times to contact Newcourt, but Newcourt did not respond.  Crest Ridge then cancelled its order with Newcourt and covered by obtaining paneling from Alply, Inc. at a higher price. Newcourt never shipped any paneling to Crest Ridge.

Crest Ridge sued Newcourt for breach of contract in New Jersey state court.  Newcourt removed the action to federal court, alleging diversity of citizenship.  The New Jersey federal court transferred the case to the Eastern District of Texas, where it was tried to a jury.  At the close of the plaintiff's case, Newcourt moved for judgment as a matter of law, citing the "subject to credit department approval" phrase in its price quotation and

---

[1]  The parties dispute Newcourt's motivation for taking this action.  Crest Ridge elicited testimony from Newcourt's management that Newcourt had fallen on hard financial times and had fired much of its architectural paneling staff.  Newcourt argued that it was unable to verify Crest Ridge's credit-worthiness.

arguing that no contract could have existed because Crest Ridge never obtained the approval of Newcourt's credit department. The district court denied the motion, which Newcourt did not renew either at the close of all the evidence or after the jury's verdict.

The district court instructed the jury regarding the definition of a contract and the nature of contract formation. Neither party objected to the charge. In response to the three interrogatories put to it, the jury found that a contract existed between Crest Ridge and Newcourt, that Newcourt breached the contract, and that Crest Ridge's damages totaled $70,214.28.

II

The sole issue on this appeal is whether the evidence was sufficient to support the jury's verdict that a contract existed between Newcourt and Crest Ridge and that Newcourt breached the contract. Newcourt argues that its price quotation was issued subject to credit department approval. It argues that no contract existed because Crest Ridge's uncertain financial status prevented Newcourt's credit department from approving the deal. Alternatively, Newcourt argues that the phrase "subject to credit department approval" illustrated that it never agreed to extend credit to Crest Ridge and thus that its demand of payment up front constituted no breach of contract.

Under <u>Boeing Co. v. Shipman</u>, 411 F.2d 365, 368-70 (5th Cir. 1969) (en banc), we must uphold the jury's verdict against Newcourt unless the evidence, viewed in the light most favorable to Crest

6

Ridge, required a reasonable jury to find either that no contract existed or that Newcourt committed no breach of contract.  See Brock v. Merrell Dow Pharmaceuticals, Inc., 874 F.2d 307, 308-09 (5th Cir.), modified by 884 F.2d 166 (5th Cir. 1989), cert. denied, 494 U.S. 1046 (1990).[2]

The Uniform Commercial Code governs the substantive legal issues in this case.  Wall panels are "things . . . which are movable at the time of identification to the contract for sale" and are thus considered "goods."  Tex. Bus. & Com. Code Ann. § 2.105(a) (Tex. UCC) (Vernon 1994).[3]  Both Crest Ridge and Newcourt are entities deal in wall paneling or employ agents having specialized knowledge of wall paneling and are thus "merchants."  Tex. Bus. & Com. Code Ann. § 2.104(a) (Tex. UCC) (Vernon 1994).

The jury heard evidence sufficient to allow it to conclude that Newcourt and Crest Ridge formed a contract.  The UCC provides that "[a] contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  Tex. Bus. & Com. Code Ann. § 2.204(a) (Tex. UCC) (Vernon 1994).  Newcourt and Crest Ridge exchanged a price quotation and a purchase order, documents the construction industry considered to have binding

---

[2]  The parties have not briefed the question of whether Newcourt's failure to renew its motion for a judgment as a matter of law after either the close of all the evidence or the jury's verdict should make our standard of review more deferential. Because the use of a more deferential standard would not affect our decision in this case, we do not address this issue.

[3]  The parties agree that Texas substantive law governs this dispute.

7

effect. Moreover, the parties' conduct illustrated that they thought they had a deal. The evidence showed that from October, 1990 to March, 1991, the parties engaged in an extended exchange designed to clarify the details of the project. Newcourt itself provided material samples, three revisions of shop drawings, fastening details, stipulations as to the color of each panel, and final drawings showing where each panel would go.

Newcourt did state that its price quotation was subject to credit department approval, but in light of the extensive dealings and preparations between these two parties, the jury could conclude this clause at most created a condition precedent on Newcourt's obligation to perform and did not prevent the formation of a contract. Similarly, the fact that the parties specified no payment terms does not require us to reverse the jury's verdict. See Tex. Bus. & Com. Code Ann. § 2.204© (Tex. UCC) (Vernon 1994) ("Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonable certain basis for giving an appropriate remedy."). The jury could find that Crest Ridge and Newcourt intended to make a deal, and that Crest Ridge's cover with Alply, Inc. provided a reasonably certain basis for the calculation of damages.

For two reasons, we find unpersuasive Newcourt's alternative argument that insufficient evidence supported the jury's finding that Newcourt breached its contract with Crest Ridge. First, the phrase "subject to credit department approval" does not constitute

8

a refusal to grant credit. Indeed, the requirement of credit department approval would be unnecessary unless the parties contemplated some form of credit. Second, because Newcourt and Crest Ridge left the terms of payment blank in their exchange of price quotation and purchase order, payment was due either upon delivery, see Tex. Bus. & Com. Code Ann. § 2.310(1) (Tex. UCC) (Vernon 1994), or perhaps according to "general usage," see Rusk County Electric Cooperative, Inc. v. Flanagan, 538 S.W.2d 498, 499-500 (Tex. Civ. App. - Tyler 1976, writ ref'd n.r.e.). In either case, Newcourt breached the agreement by demanding full payment in advance.

We find the evidence sufficient to support the jury's verdict that a contract existed and that Newcourt breached it. Newcourt has appealed no other issues, and therefore we affirm the judgment of the district court.

AFFIRMED.

BENAVIDES, Circuit Judge, specially concurring:

Because I agree that the evidence is sufficient to support the jury's verdict that a contract existed and that Newcourt breached it, I concur in the judgment. I write separately because I reach the same conclusion as the majority, but by a different path—one I believe is consistent with the general principles of contract law and the Uniform Commercial Code.

The majority accurately recaps the factual background of this dispute. Newcourt initially issued a price quote to J.B. & Associates. This was followed by an "add-on" price quote to Crest Ridge. Both of these price quotes explicitly stated the terms were "subject to credit department approval." On January 4, 1991, Crest Ridge issued a purchase order for the wall paneling; this purchase order left the terms of payment blank. A flurry of correspondence ensued concerning the details of the project including job specifications, revisions of shop drawings, final drawings, samples, and strength of coils and fasteners. On March 25, 1991, Newcourt issued a demand letter suspending all work on the project unless there was payment in full by April 5. The subcontractor Crest Ridge, unable to make full advance payment, was forced to cover with more expensive paneling purchased under the conventional industry terms of a 45-day billing cycle. Viewing Newcourt's payment-in-full demand as a breach of contract, Crest Ridge sued.

Following trial, the jury returned a verdict that both a contract existed between the parties and that Newcourt breached it. Newcourt appeals arguing that a price quote issued "subject to credit department approval" that is accepted by a purchase order silent as to credit terms cannot create an enforceable contract because there was no agreement as to essential terms.

As the majority correctly notes, this transaction for the sale of paneling between merchants is governed by the Uniform Commercial Code. See Tex. Bus. & Com. Code Ann. §§ 2.104(a), .105(a) (Tex. UCC) (West 1994). Unfortunately, the UCC does not answer every question about business transactions gone awry. As the Code itself notes, common law principles of law and equity continue to supplement its provisions. See id. § 1.103. One such question concerning contract formation is presented in this case.

The majority intimates that because "Newcourt and Crest Ridge exchanged a price quotation and a purchase order, documents the construction industry considered to have binding effect" a contract was formed. Maj. op. at 7-8. I believe the issue is more complex. It is hornbook law that contract formation requires offer and acceptance. Industry custom can fill in missing terms of a contract or determine the meaning of an agreement. See Tex. Bus. & Com. Code Ann. § 2.208 (Tex. UCC) (West 1994). Likewise, the UCC allows agreement to be expressed by conduct. See id. § 2.204(a). However, contract formation continues to hinge on the existence of an acceptable offer. The UCC, however, provides no guidance as to what an "offer" is.

Newcourt premises its argument on the belief that its price quote was the offer subsequently accepted by Crest Ridge's purchase order. However, in this case, there are two documents that could operate as an offer: Newcourt's initial price quote (subject to credit department approval) or Crest Ridge's purchase order (silent as to terms). In deciding whether a contract was formed and its subsequent terms, it is critical to determine which is the "offer" capable of being accepted.

In general, whoever sends the first form is usually considered the offeror. 1 James J. White & Robert S. Summers, Uniform Commercial Code § 1-3, at 10 n.8 (4th ed. 1995). A price quotation, if detailed enough, can constitute an offer capable of acceptance. See Axelson, Inc. v. McEvoy-Willis, 7 F.3d 1230, 1232-33 (5th Cir. 1993); Gulf States Utils. Co. v. NEI Peebles Elec. Prods., Inc., 819 F. Supp. 538, 549 (M.D. La. 1993); Quaker State Mushroom v. Dominick's Finer Foods, 635 F. Supp. 1281, 1284 (N.D. Ill. 1986). However, to do so, it must reasonably appear from the price quote that assent to the quote is all that is needed to ripen the offer into a contract. Gulf States, 819 F. Supp. at 549; Quaker State, 635 F. Supp. at 1281. A price quote that is subject to the seller's confirmation is not an offer because the buyer's assent will not consummate the contract. See Axelson, 7 F.3d at 1233 (under Texas law, price quotation requiring seller to accept order could not be an offer, but only invitation for an offer); see also Gulf States, 819 F. Supp. at 549; Quaker State, 635 F. Supp. at 1284. In essence, such qualifying language converts what could

12

have been an offer into a proposal or preliminary negotiation. Technographics, Inc. v. Mercer Corp., 777 F. Supp. 1214, 1216 (M.D. Pa. 1991), aff'd, 26 F.3d 123 (3d Cir. 1994).

Newcourt's price quote[4] was made "subject to credit department approval." The inclusion of this condition precludes the price quote from operating as an offer because Crest Ridge's assent could not consummate the deal.[5] See Gulf States, 819 F. Supp. at 549-50 (price quote reserving seller's right to back away from deal not an offer); Technographics, 777 F. Supp. at 1216 (inclusion of home office acceptance clause invalidates price quote as offer); Quaker State, 635 F. Supp. at 1284-85 (price quotation subject to company confirmation not an offer).

The fact that Newcourt's price quote could not operate as an offer does not, however, preclude contract formation. Since the Newcourt price quotation was not an offer, Crest Ridge's subsequent purchase order constituted the first offer, acceptance of which constitutes a valid contract. Axelson is instructive. In Axelson,

---

[4]     It is undisputed that Newcourt never supplied a specific price quote with all material terms to Crest Ridge. However, I assume for purposes of this discussion that Newcourt's price quote made to J.B. & Associates plus the add-ons to Crest Ridge constitute a "price quote" to Crest Ridge.

[5]     I do not contend that all "subject to" conditions prevent contract formation. However, Newcourt's offer made "subject to credit department approval" is essentially the same as one made "subject to Newcourt's approval." Such an offer is insufficiently firm to support a contract in the context presented herein. This is especially true where the testimony at trial indicated that the credit decision was to be made by a triumvirate composed of Newcourt's president, vice-president, and chief financial officer—the same people who were involved in the negotiations of the deal.

we noted that a price quote containing all material terms could be construed as an offer capable of acceptance by the buyer. 7 F.3d at 1233. However, we immediately stated that "[t]here is one problem with this analysis." Id. That problem was language in the Axelson price quote implying that the supplier had to accept orders before a contract was concluded. If this type of provision was present, "the quotation could not be an offer; it would only be an invitation for an offer." Id. This is precisely what we have present in this case. Consequently, Crest Ridge's purchase order becomes the first offer capable of acceptance by Newcourt. See Technographics, 777 F. Supp. at 1216; Master Palletizer Sys., Inc. v. T.S. Ragsdale Co., 725 F. Supp. 1525, 1531 (D. Colo. 1989), aff'd, 937 F.2d 616 (10th Cir. 1991). Newcourt did not send an explicit confirming memorandum accepting this purchase order offer. However, the UCC makes clear that a contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by the parties. See Tex. Bus. & Com. Code Ann. § 2.204(a) (Tex. UCC) (West 1994); see also Axelson, 7 F.3d at 1233 (conduct by parties recognize existence of contract).

The question of whether an agreement was reached is generally a fact question where, as here, the existence of the agreement is disputed. Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enters., 625 S.W.2d 295, 298 (Tex. 1981). In this case, the jury was instructed that agreement could be manifested by conduct. As the majority recounts, there is evidence from which a jury could

14

conclude that Newcourt's conduct reflected an assent to the underline purchase order offer.[6] The extended exchange between the parties following the receipt of the purchase order documents Newcourt's acceptance. Newcourt was intricately involved in the details of the project providing samples, revisions of shop drawings, fastening details, color stipulations, and final drawing showing where each panel will go. In short, I agree with the majority that a jury could find that Newcourt's conduct illustrated that it thought they had a deal.

Furthermore, the open payment term of Crest Ridge's purchase order offer does not prevent contract formation as a matter of law. The open term would simply be filled in according to UCC provisions. See Tex. Bus. & Com. Code Ann. §§ 2.204(c), .310(1) (Tex. UCC) (West 1994). Following a finding of contract formation, a reasonable jury could also conclude that Newcourt's demand for

---

[6]    The evidence does not support a finding of credit department approval, nor could industry practice with respect to the unstated payment terms negate this specific condition contained in Newcourt's purported offer. However, such approval is irrelevant to the case at bar. The credit approval condition was part of Newcourt's preliminary invitation to an offer. As previously discussed, the offer capable of acceptance was Crest Ridge's purchase order which left the payment term blank. Thus, I would reject Newcourt's argument that its price quote was either an offer or that its "subject to credit department approval" language was somehow subsumed into the subsequent contract with Crest Ridge.

Had Newcourt's initial price quote not suffered from the infirmity previously discussed, in my view a different result would indeed be required. This is because the "subject to credit approval" language, if treated as a condition precedent to contract formation, precludes the formation of a contract except upon realization of that condition, which indisputably never occurred. On the other hand, if the "subject to" language is treated as a condition precedent to an obligation to perform, a contract could be formed, but there could be no finding of breach because the condition to performance was never met.

15

payment in advance constituted a breach of contract. Likewise, Crest Ridge's cover with an alternate supplier provided a reasonably certain basis for the calculation of damages.

In this proceeding involving the sale of goods between merchants, the UCC, complemented by common law contract principles, dictates the result reached today. Newcourt was indeed the master of its own offer. However, in choosing to include a requirement of credit department approval, Newcourt crafted a putative offer that was insufficiently firm. This transformed Newcourt's price quote into an invitation to Crest Ridge to make an offer. Because Newcourt's price quote was not an offer capable of acceptance, I disavow any language to that effect. However, Crest Ridge's subsequent purchase order was a valid offer to buy goods which a reasonable jury could conclude was accepted by Newcourt's conduct and later breached by Newcourt's demand letter. I therefore concur in the judgment.