PATRICK E. HIGGINBOTHAM, Circuit Judge:
This diversity case concerns a dispute between a subcontractor and a supplier. The supplier appeals, on the grounds of sufficiency of the evidence, a jury verdict awarding the subcontractor damages for breach of contract. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.
I
In 1989, two brothers, John and Joseph Brower, formed a company called Crest Ridge Construction Group, Inc. and sought to enter the construction business. Previously, the Browers had brokered construction deals through a company called J.B. & Associates.
In early 1990, Taylor Woodrow Construction Co., a general contractor, awarded a subcontract to Crest Ridge for certain portions of the construction of the Liberty Science Center in Jersey City, New Jersey. One portion of the subcontract required Crest Ridge to supply architectural wall paneling for the Center. The Browers began discussions with Newcourt, Inc., a former client of J.B & Associates that supplied relatively low-cost foam paneling. The Browers succeeded in gaining Taylor Woodrow’s approval for the use of Newcourt’s foam paneling in the construction of the Center, and the parties began to exchange information detailing the requirements for the paneling job.
In late October, 1990, Newcourt issued a price quotation to J.B. & Associates of $758,-000 to supply the necessary paneling. The price quotation was made “subject to credit department approval.” Four days later, John Brower wrote to Newcourt requesting that Newcourt issue a quotation to the name of Crest Ridge and that Newcourt make further clarifications regarding the details of the job. The record contains no subsequent price quotation in the name of Crest Ridge. It does, however, contain two “add-ons,” modifications to the price quotation reflecting changes in Newcourt’s understanding of the job specifications, issued from Newcourt to Crest Ridge. These add-ons increased Newcourt’s price quote to $760,000.
On November 7, 1990, Crest Ridge sent Newcourt a completed credit application form reciting that Crest Ridge had been established in 1985 and listing one banking and four trade references. That same day, Newcourt contacted Crest Ridge’s banking reference and discovered that Crest Ridge had opened an account early in 1990 bearing an average balance of $5000. Newcourt also contacted Crest Ridge’s trade references. One wrote back on November 20, stating, “No knowledge of this aceount-perhaps we dealt with them under a different name.” On December 3, a second responded, “No a/c. Please supply a/c #.” Newcourt did not hear from the other references.
Newcourt began investigating other methods of guaranteeing payment. The record includes contradictory information regarding the results of this investigation. In January, 1991, Newcourt contacted an attorney in New Jersey about the possibility of placing a lien on the Liberty Science Center. Calvin Court, president of Newcourt, testified that in January or February of 1991, he knew that Newcourt could place a lien on the prop *149 erty. In contrast, a letter from Newcourt to Crest Ridge dated February 8, 1991 stated that the property search “raised questions.” This letter reiterated a request made on January 25 for either a copy of a payment bond protecting Newcourt or sufficient information allowing Newcourt to secure a copy of such a bond on its own. One month later, Crest Ridge faxed Newcourt the name and address of Crest Ridge’s bonding company. Newcourt did not contact the bonding company. John Brower testified that Crest Ridge sent Newcourt a copy of a bond guaranteeing Taylor Woodrow’s payment to Crest Ridge late in 1990, but Crest Ridge did not introduce a copy of this correspondence or the bond into evidence. In early March, New-court contacted American Credit Indemnity Company and was unable to purchase accounts receivable insurance from that company. The record includes no information about the specifics of this communication between American and Newcourt.
Meanwhile, the parties continued to exchange information. On January 4, 1991, Crest Ridge issued a purchase order to Newcourt quoting a price of $760,000 and referencing Neweourt’s original price quotation and its two add-ons. The record includes a flurry of letters from October, 1990 to March, 1991 between Crest Ridge and Newcourt concerning the details of the project. Newcourt supplied samples of its wall paneling material, job specifications and calculations, three revisions of shop drawings, and final drawings showing where each panel would be placed at the Center. Crest Ridge and Newcourt had extended discussions over coils and over the strength of wall paneling fasteners. Newcourt was to make the first shipment of wall paneling later in 1991.
Testimony at the trial established certain customs and practices in the construction industry. First, the industry considered a purchase order issued in response to a price quotation as a binding event. Second, construction companies presumed that a supply contract without payment terms would proceed pursuant to a standard schedule. According to this schedule, the supplier billed the subcontractor by the 25th of the month and could expect payment by the tenth of the second month thereafter. This 45-day interval allowed a bill to travel from the subcontractor to the general contractor to the owner, and for payment to return from the owner to the general contractor to the subcontractor to the supplier.
On March 25, 1991, Newcourt wrote to Crest Ridge suspending all further work on the wall paneling project and demanding payment in full by April 5. The letter did not mention credit problems; it gave as Newcourt’s reasons for demanding full payment “the encumbering and confusing progress and lack of receiving pertinent data necessary to satisfy the requirements on the above-referenced project.”[1] In response to the March 25 demand letter, Crest Ridge attempted several times to contact Newcourt, but Newcourt did not respond. Crest Ridge then cancelled its order with Newcourt and covered by obtaining paneling from Alply, Inc. at a higher price. Newcourt never shipped any paneling to Crest Ridge.
Crest Ridge sued Newcourt for breach of contract in New Jersey state court. Newcourt removed the action to federal court, alleging diversity of citizenship. The New Jersey federal court transferred the case to the Eastern District of Texas, where it was tried to a jury. At the close of the plaintiffs case, Newcourt moved for judgment as a matter of law, citing the “subject to credit department approval” phrase in its price quotation and arguing that no contract could have existed because Crest Ridge never obtained the approval of Neweourt’s credit department. The district court denied the motion, which Newcourt did not renew either at the close of all the evidence or after the jury’s verdict.
The district court instructed the jury regarding the definition of a contract and the nature of contract formation. Neither party objected to the charge. In response to the *150 three interrogatories put to it, the jury found that a contract existed between Crest Ridge and Newcourt, that Neweourt breached the contract, and that Crest Ridge’s damages totaled $70,214.28.
II
The sole issue on this appeal is whether the evidence was sufficient to support the jury’s verdict that a contract existed between Neweourt and Crest Ridge and that Newcourt breached the contract. Newcourt argues that its price quotation was issued subject to credit department approval. It argues that no contract existed because Crest Ridge’s uncertain financial status prevented Neweourt’s credit department from approving the deal. Alternatively, Newcourt argues that the phrase “subject to credit department approval” illustrated that it never agreed to extend credit to Crest Ridge and thus that its demand of payment up front constituted no breach of contract.
Under Boeing Co. v. Shipman, 411 F.2d 365, 368-70 (5th Cir.1969) (en banc), we must uphold the jury’s verdict against New-court unless the evidence, viewed in the light most favorable to Crest Ridge, required a reasonable jury to find either that no contract existed or that Newcourt committed no breach of contract. See Brock v. Merrell Dow Pharmaceuticals, Inc., 874 F.2d 307, 308-09 (5th Cir.), modified, by 884 F.2d 166 (5th Cir.1989), cert. denied, 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990).[2]
The Uniform Commercial Code governs the substantive legal issues in this case. Wall panels are “things ... which are movable at the time of identification to the contract for sale” and are thus considered “goods.” Tex.Bus. & Com.Code Ann. § 2.105(a) (Tex. UCC) (Vernon 1994).[3] Both Crest Ridge and Newcourt are entities deal in wall paneling or‘employ agents having specialized knowledge of wall paneling and are thus “merchants.” Tex.Bus. & Com. Code Ann. § 2.104(a) (Tex. UCC) (Vernon 1994).
The jury heard evidence sufficient to allow it to conclude that Newcourt and Crest Ridge formed a contract. The UCC provides that “[a] contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.” Tex.Bus. & Com.Code Ann. § 2.204(a) (Tex. UCC) (Vernon 1994). New-court and Crest Ridge exchanged a price quotation and a purchase order, documents the construction industry considered to have binding effect. Moreover, the parties’ conduct illustrated that they thought they had a deal. The evidence showed that from October, 1990 to March, 1991, the parties engaged in an extended exchange designed to clarify the details of the project. Newcourt itself provided material samples, three revisions of shop drawings, fastening details, stipulations as to the color of each panel, and final drawings showing where each panel would go.
Newcourt did state that its price quotation was subject to credit department approval, but in light of the extensive dealings and preparations between these two parties, the jury could conclude this clause at most created a condition precedent on Newcourt’s obligation to perform and did not prevent the formation of a contract. Under Texas law, there are two types of conditions precedent. A condition precedent to the formation of a contract prevents the formation of a contract except upon realization of the condition. Hohenberg Brothers Co. v. George E. Gibbons & Co., 537 S.W.2d 1, 3 (Tex.1976). A condition precedent to an obligation to perform, on the other hand, does not prevent contract formation, but does prevent a duty to perform from arising except upon realization of the condition. Id. As such, a condition precedent to an obligation to perform may be one of several terms of an already formed eon- *151 tract. Whether the parties intended to form a contract is a question for the jury. Foreca, S.A. v. GRD Development Co., 758 S.W.2d 744, 746 (Tex.1988). Thus, the question of whether Crest Ridge and Newcourt intended for the “subject to credit department approval” language to prevent contract formation was a jury issue.[4]
Similarly, the fact that the parties specified no payment terms does not require us to reverse the jury’s verdict. See Tex. Bus. & Com.Code Ann. § 2.204© (Tex. UCC) (Vernon 1994) (“Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonable certain basis for giving an appropriate remedy.”). The jury could find that Crest Ridge and Newcourt intended to make a deal, and that Crest Ridge’s cover with Alply, Inc. provided a reasonably certain basis for the calculation of damages.
For two reasons, we find unpersuasive Newcourt’s alternative argument that insufficient evidence supported the jury’s finding that Newcourt breached its contract with Crest Ridge. First, the phrase “subject to credit department approval” does not constitute a refusal to grant credit. Indeed, the requirement of credit department approval would be unnecessary unless the parties contemplated some form of credit. Second, because Newcourt and Crest Ridge left the terms of payment blank in their exchange of price quotation and purchase order, payment was due either upon delivery, see Tex.Bus. & Com.Code Ann. § 2.310(1) (Tex. UCC) (Vernon 1994), or perhaps according to “general usage,” see Rusk County Electric Cooperative, Inc. v. Flanagan, 538 S.W.2d 498, 499-500 (Tex.Civ.App. — Tyler 1976, writ refd n.r.e.). In either case, Newcourt breached the agreement by demanding full payment in advance.
We find the evidence sufficient to support the jury’s verdict that a contract existed and that Newcourt breached it. Neweourt has appealed no other issues, and therefore we affirm the judgment of the district court.
AFFIRMED.

. The parties dispute Newcourt’s motivation for taking this action. Crest Ridge elicited testimony from Newcourt's management that Newcourt had fallen on hard financial times and had fired much of its architectural paneling staff. New-court argued that it was unable to verify Crest Ridge's credit-worthiness.

. The parties have not briefed the question of whether Newcourt’s failure to renew its motion for a judgment as a matter of law after either the close of all the evidence or the jury's verdict should make our standard of review more deferential. Because the use of a more deferential standard would not affect our decision in this case, we do not address this issue.

. The parties agree that Texas substantive law governs this dispute.

. In articulating these principles, we do not depart from the well-settled Texas rule that the interpretation of unambiguous terms in a contract presents a question of law for the court. See, e.g., Assicurazioni Generali, S.p.A. v. Ranger Insurance Co., 64 F.3d 979, 980-81 (5th Cir. 1995). As we have explained, to the extent that the "subject to credit department approval” language concerned contract formation, it presented a jury question. Had the parties disputed the legal effect that this clause had upon an already formed contract, the district court would have been obligated to decide the issue.