# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 19, 2011

Lyle W. Cayce
Clerk

No. 10-20217

J.D. FIELDS & COMPANY, INC.,

Plaintiff-Appellant

v.

UNITED STATES STEEL INTERNATIONAL, INC.,

Defendant-Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:08-CV-3076

Before JONES, Chief Judge, BENAVIDES, Circuit Judge, and AYCOCK, District Judge.[*]

SHARION AYCOCK, District Judge:[**]

J.D. Fields & Company, Inc. appeals the district court's grant of summary judgment in favor of United States Steel International. The district court held that two separate price quotations sent from United States Steel International could not be construed as offers as a matter of law. The district court further, in

---

[*] District Judge of the Northern District of Mississippi, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

a sua sponte grant of summary judgment, held that J.D. Fields could not prove a claim of fraudulent inducement. We affirm in part and reverse in part the district court's judgment.

## Background

United States Steel International ("USSI") sells and markets steel products manufactured at domestic steel mills for international sale.[1] J.D. Fields is a steel-product distributor, serving as a conduit between manufacturers and end-users. On at least thirty occasions from 2003 through 2008, J.D. Fields entered into contracts with USSI to purchase steel products. USSI produced copied documents pertaining to its prior transactions with J.D. Fields. These documents appear to show that, on most occasions, USSI and J.D. Fields followed a general course of dealing. This course of dealing appears to be as follows: (1) J.D. Fields requested a price quotation from USSI, either orally or via email; (2) USSI sent J.D. Fields a price quotation; (3) J.D. Fields sent USSI a purchase order; (4) USSI sent J.D. Fields an order acknowledgment; and (5) USSI shipped the product and sent J.D. Fields an invoice. J.D. Fields contests this general course of dealing, stating that USSI had an "inconsistent pattern of delivering its acknowledgments."

The current dispute arises out of two specific transactions stemming from a series of emails. In both transactions, it is undisputed that while USSI sent J.D. Fields a price quotation and J.D. Fields responded with a purchase order, USSI never transmitted an order acknowledgment. USSI did, however, correspond with J.D. Fields several times regarding the orders. J.D. Fields contends that the series of emails created two separate binding contracts.

---

[1] USSI is a subsidiary of the United States Steel Corporation.

Specifically, J.D. Fields asserts that USSI's price quotations constituted "offers," which J.D. Fields accepted by submitting purchase orders.

A. First Alleged Contract: Purchase Order 45850

On February 6, 2008, Guillermo Moll, a J.D. Fields representative, sent an email to Kris Blackman, a USSI representative, requesting "price and delivery options" for 800 feet of a type of seamless carbon steel pipe. After a short email exchange between the parties specifying the destination of the product, Blackman responded by email on the same day providing Moll with a price quote. Blackman's email stated as follows:

> I can offer:
>
> 800 FT - 16" OD x 0.844" WT (SCH80) $2133/mt ($132.30/ft)
>
> Subject to heat lot accumulation 100 tons
> Net 30 days
> Quote valid for 14 days
> Delivery: Rolling end of March

Moll then, on the same day, requested a modification in the steel specifications, asking Blackman if USSI could "roll it to API 5L-X56/60 PSL-2" since the customer had sent Moll a new note. Blackman responded with a new price quote of "$2205/mt ($136.74/ft)."

Five days later, on February 11, 2008, Moll faxed Blackman Purchase Order ("P.O.") 45850 for 880 feet at a unit price of $136.74 per foot. It is entirely undisputed that 880 feet of the specified type of pipe requires approximately 60 tons of steel. It is also undisputed that "[s]ubject to heat lot accumulation 100 tons" means that the steel mill will only roll the steel in a batch of at least 100 tons.

On February 14, 2008, Moll emailed Blackman regarding this order,

stating "Please advise when is the expected rolling for the subject PO." Blackman responded the same day as follows:

> The mill has gotten back with me . . . this material is subject to heat lot of 100 tons and has to be rolled. This material is subject to roll at the mill the first part of April. Please let me know if we can proceed with the order of 100 tons and if so I will need a revised PO.

It is undisputed that Moll never sent a revised purchase order. It is also undisputed that USSI never remitted an order acknowledgment regarding P.O. 45850.

On March 26, 2008, another email exchange took place between the parties regarding P.O. 45850. Moll initially contacted Blackman stating:

> Per our conversation of last Wednesday pertaining the subject purchase order, could you please provide us with an update on the heat-lot accumulation and where this order stands, including the increase? Also, please send to us an order confirmation form [sic] the mill.

Blackman responded the same day as follows:

> I have ran [sic] my traps and have not found any other order to piggy back on, so that means 100 tons minimum and I can not [sic] deliver this until August 08 and is subject to price increase. Let me know how you would like to proceed.

Moll then responded:

> Thank you for your reply; unfortunately, we cannot keep our overseas customers waiting indefinitely, we have to give them a more accurate answer or we risk loosing [sic] them. Therefore, we are looking into increasing our order to the point you have the minimum 100 tons; have you received any other orders for this size? Please advise when we can have the material rolled considering that we will reach the 100 tons.

4

As the district court noted, Moll alleged in his deposition testimony that he also discussed this order with Blackman on the phone and stated that, "if need be, we will go up to 100 tons." However, Moll never sent a revised purchase order for an order of 100 tons or greater.

On April 24, 2008, Moll sent another email to Tom Verellen, Blackman's supervisor at USSI, requesting a status update and order acknowledgment regarding purchase orders 45850 and 46110.[2] In regards to P.O. 45850, Moll wrote the following:

> We would like to bring to your attention the following matters, for which we kindly request a prompt reply: PO # 45850:
> 1) Order placed in 02.11.08
> 2) In March of this year we were advised that you did not have any other orders for the material ordered and that you needed 100 NT minimum.
> 3) On 03.26.08 we advised we would increase the order to 100 NT
> 4) On 04.10.08 we requested an update on the delivery, to no avail. We are yet to see an acknowledgment.

Verellen responded that Blackman would respond to the email when he returned to town the following week. Blackman's follow-up email to Moll, sent on May 30, 2008, stated:

> I will attempt to address the issues below. As I stated in our last phone conversation about 4-5 weeks ago concerning these PO's, we were in the middle of a price increase and not taking orders at that time. Both of these PO's fell into these categories.
>
> We still are currently not taking orders because 1 our mills are full and 2 we have consumed all of our tons for export. I apologize for the inconvenience or misunderstanding but I recall stating in our conversation on the phone that these orders were never excepted

---

[2] P.O. 46110 is the second disputed transaction in this case and is discussed in detail below.

[sic] nor acknowledged therefore, we do not have these orders in our system and do not have the material available at this time.

Moll responded:

The fact that these Purchase orders were sent to US Steel in early February and early March, did not put them in the same group of our conversation of 4 to 5 weeks ago and my follow-up emails. What really worries me, is that we commited [sic] to customers based on US Steel's word of profunction [sic] for June 2008 and proceeded to send you purchase orders and increase our order to meet minimums, as well; now we will have to tell them that their orders were never accepted?

Blackman in turn responded that, after checking his records, he confirmed that USSI was indeed not taking orders in February and March. Blackman stated that USSI could not accept the orders, as there was no material available to offer. Moll responded that Blackman's previous emails "pointed towards [USSI's] acceptance" of the orders. To this, Blackman responded that the "fact of the matter is these orders were never acknowledged." Blackman further concluded that he had "given [ ] valid information why these orders were not accepted," and that USSI would "not be accepting orders from J.D. Fields from this point forward."

B. Second Alleged Contract: Purchase Order 46110

On March 5, 2008, Moll emailed Blackman stating that he had "another inquiry for [him]" regarding two types of seamless pipe. Moll requested Blackman provide him with a quote on the two types of pipe to be delivered FOB Port of Houston:

Please quote the following materials from a LATAM request: 3260 ft 16" x .500 wall, SMLS, API5LX52 PSL2, 40 ft max., NACE MRO

6

175 certified 2890 ft 12" x .500 wall, SMLS, API5LX52 PSL2, 40 ft max., NACE MRO 175 certified

Blackman responded to this email on March 13, 2008:

We can offer

$2000/nt for the 12"
$2040/nt for the 16"

June or sooner
FCA Houston
Net 30 days
Valid for 14 days

On March 18, 2008, Moll faxed Blackman P.O. 46110, ordering 3,260 feet of a specified sixteen-inch pipe at $2,040 per net ton ($84.507 per foot) and 2,890 feet of a specified twelve-inch pipe at $2,000 per net ton ($136.740 per foot). It is entirely unclear what happened to P.O. 46110 after Moll faxed it to USSI. In his deposition testimony, Blackman stated that the order may have "fallen through the cracks," and thus was never processed at USSI.

On April 24, 2008, Moll contacted Blackman's supervisor, Verellen, requesting a status update and order acknowledgment regarding purchase orders 45850 and 46110. Moll asked Verellen to "please advise what is the status on both orders and when can we expect them to be shipped, as well as, receiving an order acknowledgment for each one[.]" Blackman emailed Moll on May 30, 2008, notifying that P.O. 45850 and P.O. 46110 had not been entered into USSI's systems, that USSI never sent J.D. Fields an order acknowledgment, and that USSI did not plan to fill the orders.

Standard of Review

The court reviews de novo a district court's grant or denial of summary judgment, applying the same standard as the district court. Holt v. State Farm Fire & Cas. Co., 627 F.3d 188, 191 (5th Cir. 2010) (citing Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co., 352 F.3d 254, 259-60 (5th Cir. 2003)).

Discussion

A. Contract Formation

The first issue on appeal is whether the district court properly granted summary judgment on J.D. Fields' breach of contract claims when it concluded that USSI's price quotations could not reasonably be construed as offers as a matter of law. Because this case is before the Court on diversity jurisdiction, state law supplies the applicable substantive authority. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78-79, 58 S. Ct. 817, 822 L. Ed. 1188 (1938). "'When parties enter into a contract for the sale of goods, the Uniform Commercial Code ("UCC") controls the conduct of the parties." Coburn Supply Co., Inc. v. Kohler Co., 342 F.3d 372, 375 (5th Cir. 2003) (quoting Glenn Thurman, Inc. v. Moore Constr., Inc., 942 S.W.2d 768, 771 (Tex. App. 1997)). There is no dispute that Article 2 of the UCC governs this transaction, as the contracts at issue concern the sale of steel.[3] Steel qualifies as a "thing[] . . . which [is] movable at the time of identification to the contract for sale," and therefore it is considered a "good."

---

[3] While there is no dispute that the UCC controls, there was some disagreement in the district court as to whether Texas or Pennsylvania law should govern the contract negotiations at issue. After finding that the result would not be different under Pennsylvania law, the district court concluded that Texas law should control. The decision to apply Texas law is not challenged on appeal. Further, Texas and Pennsylvania both have adopted UCC Article 2 in substantially similar form, and the parties have both cited to Texas law in their briefs. Thus, we apply Texas law in analyzing this action.

TEX. BUS. & COM. CODE ANN. § 2.105(a). Where the UCC applies, it displaces all common law rules of law regarding breach of contract and substitutes instead those rules of law and procedures set forth in the UCC. Pacific Prods., Inc. v. Great W. Plywood, Ltd., 528 S.W.2d 286, 291 (Tex. App. 1975). However, common law principles of law and equity continue to supplement its provisions. Crest Ridge Constr. Group, Inc. v. Newcourt Inc., 78 F.3d 146, 152 (5th Cir. 1996).

In Texas, "the essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant, and (4) damages sustained by the plaintiff as a result of the breach." Mullins v. TestAmerica, Inc., 564 F.3d 386, 418 (5th Cir. 2009) (citing Aguiar v. Segal, 167 S.W.3d 443, 450 (Tex. App. 2005)). The central dispute in this action revolves around the first element: whether the parties ever formed a valid contract as to Purchase Order 45850 and Purchase Order 46110. "Contract formation [ ] hinge[s] on the existence of an acceptable offer. The UCC, however, provides no guidance as to what an 'offer' is." Crest Ridge, 78 F.3d at 152 (Benavides, J., concurring). Although the UCC does not define the term "offer," we have held that "[a]n offer is an act that leads the offeree reasonably to believe that assent (i.e., acceptance) will conclude the deal." Axelson, Inc. v. McEvoy-Willis, 7 F.3d 1230, 1232 (5th Cir. 1993).

A contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract. TEX. BUS. & COM. CODE ANN. §§ 2.201-.210. Generally, a price quotation, such as one appearing in a brochure or on a flyer, is not considered an offer; rather, it is typically viewed as an invitation to offer.

See, e.g., E.C. Styberg Eng'g Co. v. Eaton Corp., 492 F.3d 912, 918 (7th Cir. 2007); Nordyne, Inc. v. Int'l Controls & Measurements Corp., 262 F.3d 843, 846 (8th Cir. 2001). Despite this general rule, a price quotation, if detailed enough, can constitute an offer capable of acceptance. Crest Ridge, 78 F.3d at 152 (Benavides, J., concurring); Axelson, 7 F.3d at 1232-33; Gulf States Utils. Co. v. NEI Peebles Elec. Prods., Inc., 819 F. Supp. 538, 549 (M.D. La. 1993); Quaker State Mushroom v. Dominick's Finer Foods, 635 F. Supp. 1281, 1284 (N.D. Ill. 1986). "However, to do so, it must reasonably appear from the price quote that assent to the quote is all that is needed to ripen the offer into a contract." Crest Ridge, 78 F.3d at 152 (Benavides, J., concurring) (citations omitted).

Contract formation is a question of fact under Texas law. See, e.g., Delta Brands, Inc. v. Wysong & Miles Co., 203 F.3d 828, 1999 WL 1240802, at *1 (5th Cir. Nov. 30, 1999) (per curiam); Crest Ridge, 78 F.3d at 153 (citing Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enters., 625 S.W.2d 295, 298 (Tex. 1981) ("The question of whether an agreement was reached is generally a fact question where, as here, the existence of the agreement is disputed.")). Summary judgment, however, is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). All fact questions must be viewed in the light most favorable to the nonmovant. Delta Brands, 203 F.3d 828, 1999 WL 1240802, at *1.

### Purchase Order 45850

The first emailed price quotation was sent from USSI to J.D. Fields on February 6, 2008. The price quotation contained the following: (i) a specified price per ton, (ii) specified payment term, (iii) a general delivery time, (iv) a validity period ("valid for 14 days"), (v) specified rolling/manufacturing time

frame, (vi) product specification, (vii) the quantity (800 feet), and (viii) that the price quote was subject to heat lot accumulation of 100 tons. The price quote did not contain the specific shipping location, the mode of shipping, or the legal terms and conditions. Five days after receiving this price quote, J.D. Fields faxed USSI Purchase Order 45850.

Purchase Order 45850 contained a different quantity than the initial inquiry. That is, the purchase order requested 880 feet, whereas the price quote was for 800 feet.[4] Importantly, neither a quantity of 800 feet nor 880 feet was enough to meet the 100 ton minimum expressly required by USSI. J.D. Fields, while conceding that its quantity specifications failed to meet this 100 ton minimum, asserts that it told USSI it would increase its order. On March 26, 2008, J.D. Fields' representative, Guillermo Moll, emailed USSI representative, Kris Blackman, stating that J.D. Fields was "looking into increasing [the] order to . . . the minimum 100 tons." Similarly, Moll alleged in his deposition testimony that he also discussed this order with Blackman on the phone and stated that, "if need be, we will go up to 100 tons."

The exchange between Moll and Blackman at most establishes that J.D. Fields was considering -- or "looking into" -- increasing its order to reach the 100 ton minimum. There is no evidence that J.D. Fields in fact did increase its order or that the parties ever reached an agreement as to a quantity term meeting the 100 ton minimum.[5] The quote contained a 14-day validity period. By the time

---

[4] We note that the resolution of this issue does not require us to undertake a UCC Section 2-207 "Battle of the Forms" analysis.

[5] Quantity is a crucial component of an agreement under the Texas UCC. See OKC Corp. v. UPG, Inc., 798 S.W.2d 300, 305 (Tex. App. 1990), overruled on other grounds by Spangler v. Jones, 861 S.W.2d 392 (Tex. App. 1993).

the March 2008 exchange between Moll and Blackman occurred, the validity period for the price quote had long lapsed. Further, USSI representative Blackman repeatedly informed Moll that it would need a revised purchase order. J.D. Fields concedes that it never submitted such a revised order. As such, the district court did not err in finding that it was unreasonable as a matter of law for J.D. Fields to believe that the price quotation was an offer. Thus, we affirm the grant of summary judgment as to Purchase Order 45850.

## Purchase Order 46110

Purchase Order 46110 falls on different footing than Purchase Order 45850. While the general rule is that a price quote is not an offer, we have held that a price quote, if detailed enough, can constitute an offer capable of acceptance. See, e.g., Axelson,, 7 F.3d at 1232-33. In Tubelite, Inc. v. Risica & Sons, Inc., 819 S.W.2d 801, 803 (Tex.1991), the Texas Supreme Court found a price quotation sufficiently detailed to constitute an offer under the Texas UCC when the quote stated it was valid for 60 days, was signed by Tubelite's authorized agent, and did not limit acceptance to a specified manner. Further, in affirming the lower court in Delta Brands v. Wysong & Miles Company, we found that the characteristics of the price quote at issue "compel[ed] the conclusion that it qualifi[ed] as a firm offer under the Texas UCC and Texas precedent." 203 F.3d 828, 1999 WL 1240802, at *1; see also Axelson, 7 F.3d at 1233 (noting that a price quote containing material terms could be construed as an offer capable of acceptance by the buyer). In Delta Brands, the lower court had noted that the price quote contained product specifications, service options, and an itemized price breakdown. See Delta Brands, Inc. v. Wysong & Miles Co., 1998 WL 641810, at *4 (N.D. Tex. Sept. 14, 1998), aff'd, 203 F.3d 828, 1999 WL

1240802 (5th Cir. Nov. 30, 1999). The price quote in Delta Brands likewise contained no language of approval, or any other indicia suggesting that an order would be subject to approval before it was accepted. Id.

Here, the price quotation preceding Purchase Order 46110 was considerably detailed.[6] It was also only transmitted to J.D. Fields. See RESTATEMENT (SECOND) OF CONTRACTS § 26, cmt c (stating that a "relevant factor" for "determining whether an offer is made" is the "number of persons to whom a communication is addressed"). The quote contained the following information: (i) a specified price, (ii) delivery time, (iii) a validity period ("valid

---

[6] The Restatement (Second) of Contracts states, "In determining whether an offer is made[,] relevant factors include . . . the completeness of the terms of the suggested bargain." RESTATEMENT (SECOND) OF CONTRACTS § 26, cmt c; see also Architectural Metal Sys., 58 F.3d at 1229 (holding that the quotation specifying items to be sold, the quantity, and price of each item precluded summary judgment as to whether the quote constituted an offer); Northrop Corp. v. Litronic Indus., 29 F.3d 1173, 1176 (7th Cir. 1994) (holding that quotations submitted in response to request for offers to produce printed wire boards for defense systems constituted offers within the meaning of the UCC); Verasun Fort Dodge, LLC v. Indus. Air Tech., 2008 WL 5069121, at *16 (N.D. Iowa Nov. 25, 2008) (concluding that, as a matter of law, the quotation at issue was an offer, as it contained a description of the product, charts, quantity, price, anticipated delivery date, and length of the product's warranty); Reaction Molding Tech., Inc. v. Gen. Elec. Co., 585 F. Supp. 1097, amended, 588 F. Supp. 1280 (E.D. Pa. 1985) (holding that quotation sent in response to buyer's request and containing description, price, and payment constituted an offer).

The UCC tolerates a great deal of incompleteness and even contradiction in offer and acceptance; thus, although the price quote did not contain the specific shipping location, mode of shipping, or the legal terms and conditions, the absence of these three terms does not in and of itself prohibit the formation of a contract in light of the "gap-filling" provisions found throughout the UCC. See, e.g., TEX. BUS. & COM. CODE ANN. § 2.204(3), cmt ("the fact that one or more terms are left to be agreed upon [is not] enough [] to defeat an otherwise adequate agreement"); TEX. BUS. & COM. CODE ANN. § 2-308 (gap filler for when a contract does not specify a place for delivery); Crest Ridge, 78 F.3d at 153 (Benavides, J., concurring); Step-Saver Data Sys., Inc. v. Wyse Tech., 939 F.2d 91, 100 (3d Cir. 1991) (noting that the absence of certain warranty terms was immaterial in light of UCC's gap-filling provisions); Verasun Fort Dodge, 2008 WL 5069121, at *16 (noting that the details which were missing from the offer, including specific warranty provisions, choice-of-law clauses, and cancellation provisions, were all terms that could be filled in by the UCC).

for 14 days"), (iv) specified rolling/manufacturing time frame, (v) product specification, (vi) a reference to the quantity listed in J.D. Fields' email, and (vii) a delivery location. Further, unlike some of the previous price quotations sent to J.D. Fields from USSI, this particular price quote was devoid of any language which would condition the formation of a contract on some further step, such as approval by the mill, corporate headquarters, or subject to prior sell.[7] See Crest Ridge, 78 F.3d at 152 (Benavides, J., concurring) ("The inclusion of [a] condition [can] preclude[] [a] price quote from operating as an offer."); Architectural Metal, 58 F.3d at 1230 ("A person can prevent his [price quote] from being treated as an offer by suitable language conditioning the formation of a contract on some further step . . . such as approval by corporate headquarters."). Specifically, J.D. Fields provided evidence that previous emailed price quotes were explicitly conditioned on "mill and steel availability" or were "subject to prior sale." Moll testified via sworn affidavit that it was his understanding that when a quote from USSI gave a validity period without further condition on mill approval, it meant that the representative presenting the quote had already checked with the mill regarding the availability of the steel needed to meet the request.[8] See

---

[7] The price quote also did not contain a clause stating that it was subject to a certain heat lot accumulation.

[8] Moll's affidavit states as follows:

> The offer provided that the pipe would be delivered FCA Houston, in June or sooner, and payment would be due net thirty (30) days of the invoice. The offer further expressly stated that it was valid for fourteen (14) days. In my experience in the steel industry and in commercial sales, a validity period such as this means that the price quoted will remain unchanged if it is accepted within time prescribed by the provision. USSI's offer would therefore remain valid until Thursday, March 27, 2008 pursuant to the email. Based on the representations made in the email, my experience in the industry and my prior experience with USSI, I believed that the only further step necessary to form the contract for sale of the pipe was for J.D. Fields to accept the terms provided by USSI in a purchase order.

Architectural Metal, 58 F.3d at 1230 (finding that the district court's conclusion that the inclusion of a clause conditioning acceptance upon approval by headquarters in previous quotes should have put the parties on notice that such approval was required was a "non sequitur," as "[f]or all [the plaintiff] knew, the clause had been left out because the . . . requisite approval from the home office [had been obtained]"). J.D. Fields transmitted Purchase Order 46110 five days after receiving USSI's price quote, and the purchase order mirrored the terms contained in the price quotation.

While the district court's conclusions regarding industry custom and course of dealing in this case are relevant to the issue of reasonableness, the UCC never informs that industry custom and course of dealing are alone determinative of the issue of contract formation. See, e.g., Crest Ridge, 78 F.3d at 152 (Benavides, J., concurring) ("Industry custom can fill in missing terms of a contract or determine the meaning of an agreement"); Audio Visual Assocs., Inc. v. Sharp Elecs. Corp., 210 F.3d 254 260 (4th Cir. 2000) (noting that the UCC "does not suggest that course of dealing may in and of itself provide the basis for a contract. Rather, it supplies a mode of interpretation for construing existing

---

Moll's supplemental affidavit similarly states:

> When a sale's manager provides a quotation that includes a price, a validity period for the quote, and an approximate rolling date without any further limitations or conditions, it means that he or she has already checked the mill's schedule and verified that it has ability to process (manufacture) the order at or around the rolling date. Accordingly when I submit a purchase order which mirrors the terms of the quoted offer, it is based on the belief that USSI can provide the goods as offered.

> If, however, additional approval is needed from the mill, the quote would expressly condition the offer on acceptance by the mill. In such circumstances, I understand that the salesperson would need further approval from the mill before the order will be processed and added to the rolling schedule, and I consider this prior to submitting a purchase order and inform my customer.

contracts.") (emphasis in original). As such, industry custom and course of dealing do not compel the conclusion that a price quotation cannot be construed as an offer as a matter of law.

Contract formation is a question of fact under Texas law and, here, the price quotation was detailed, transmitted only to J.D. Fields, void of any conditional language, sent in direct response to an inquiry from J.D. Fields' representative, did not limit acceptance to a specified manner, and contained a validity period. Viewing the evidence in the light most favorable to the nonmovant, there are questions of material fact present as to whether J.D. Fields could reasonably construe the price quote relating to Purchase Order 46110 as an offer. At the summary judgment stage, we may not weigh or decide factual disputes or make credibility determinations. Although we find that summary judgment was not appropriate, we express no view on the ultimate merits of J.D. Fields' breach of contract claim. Accordingly, the grant of summary judgment as to Purchase Order 46110 is reversed and remanded for further proceedings as the district court may deem appropriate.

B. Fraudulent Inducement Claims

The next issue on appeal is whether the district court erred in sua sponte granting summary judgment on J.D. Fields' fraud claims. It is well settled that a district court can grant summary judgment sua sponte so long as the adverse party had adequate notice to come forward with all of its evidence. See Celotex Corp. v. Catrett, 477 U.S. 317, 326, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); see also Love v. Nat'l Med. Enters., 230 F.3d 765, 770-71 (5th Cir. 2000).[9] The

---

[9] We have stated that a court provides a party with adequate notice by adhering to the same time frame prescribed for a party's motion for summary judgment. See Love, 230 F.3d at 770. Specifically, in Love, we stated that adequate notice for a sua sponte grant of summary judgment is "10 days before the time fixed for the hearing." 230 F.3d at 770-71 (quoting Federal Rule of Civil Procedure 56(c)); Stingley v. Den-Mar Inc., 347 F. App'x

failure to provide such notice is reviewed for harmless error. Love, 230 F.3d at 771. The error "is harmless if the nonmoving party admits that he has no additional evidence anyway or if . . . the appellate court evaluates all of the nonmoving party's additional evidence and finds no genuine issue of material fact." Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 28 F.3d 1388, 1398 (5th Cir. 1994).

Here, the district court did not expressly give J.D. Fields notice of its intent to rule on its fraudulent inducement claims. However, even so, we find that any such error is harmless. We have held that the district court can "rectif[]y [its] initial procedural error" in not giving notice before granting summary judgment "by ruling on a motion for reconsideration." Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387, 402 (5th Cir. 1998). That is, if the party opposing the motion for summary judgment "is afforded an opportunity . . . to present the court with evidence supporting [its] arguments" in a motion for reconsideration, "the court's failure to provide an opportunity to respond is harmless error." Id. J.D. Fields had the opportunity to present additional evidence in its motion for reconsideration which it filed in the district court. However, J.D. Fields failed to produce additional evidence, or any evidence at all, of fraud in its motion for reconsideration. J.D. Fields also failed to produce any evidence of fraud on appeal. Accordingly, we find that any error in the district court's sua sponte grant of summary judgment as to J.D. Fields' claims

---

14, at 17 (5th Cir. 2009). While not impacting this case, we note that Federal Rule of Civil Procedure 56(c) was amended in 2010 and 2011. The amended Rule no longer contains this ten-day notice requirement. See FED. R. CIV. P. 56(c). Instead, Rule 56(f) now expressly recognizes that district courts may grant summary judgment sua sponte, stating that, "After giving notice and a reasonable time to respond, the court may: (1) grant summary judgment for a nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." FED. R. CIV. P. 56(f).

of fraudulent inducement is harmless. Thus, the district court's judgment is affirmed as to this claim.

## Conclusion

For the foregoing reasons, we affirm in part, reverse in part, and remand for further proceedings consistent herewith.